# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-11019

United States Court of Appeals
Fifth Circuit

**FILED**

April 25, 2017

Lyle W. Cayce
Clerk

JACKED UP, L.L.C.,

Plaintiff–Appellant,

v.

SARA LEE CORPORATION; THE J.M. SMUCKER COMPANY,
Defendants–Appellees.

_____

JACKED UP, L.L.C.,

Plaintiff–Appellant,

v.

THE J.M. SMUCKER COMPANY,

Defendant–Appellee.

_____

Appeals from the United States District Court
for the Northern District of Texas

_____

Before PRADO, HIGGINSON, and COSTA, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

In September 2011, Jacked Up, L.L.C. ("Jacked Up") and Sara Lee Corporation ("Sara Lee") signed a licensing agreement whereby Sara Lee would produce and sell energy drinks developed by Jacked Up. Shortly thereafter, Sara Lee sold its beverage division to the J.M. Smucker Company

No. 15-11019

("Smucker"). Smucker decided not to assume Sara Lee's licensing agreement with Jacked Up, and in November 2011, Sara Lee formally terminated the agreement. Jacked Up brought suit against Sara Lee, alleging breach of contract, breach of fiduciary duty, fraud, and fraudulent inducement. Jacked Up joined claims against Smucker for, among others, tortious interference with a contract and trade secret misappropriation. The district court granted summary judgment against Jacked Up on all claims. We AFFIRM in part, REVERSE in part, and REMAND for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2011, Jacked Up was a small start-up company that sold energy shots to convenience stores. Sara Lee was a large corporation with multiple well-established food and beverage brands. Jacked Up's founder and sole owner, Joe Schmitz, met some Sara Lee employees at a trade show in early 2011. Schmitz and the Sara Lee employees discussed creating a Jacked Up line of dispensed teas, coffees, and cappuccinos.[1] Sara Lee already had an "Infusia" line of vitamin-infused teas under the Pickwick brand, but these teas were not marketed as energy drinks and did not sell well. Sara Lee saw a Jacked Up line of beverages as an opportunity to enter the energy drink market and "pioneer a brand new dispensed energy beverage category."

After several months of negotiations and product development, Jacked Up agreed to license its brand name and proprietary energy ingredients to Sara Lee in exchange for royalties. Under the terms of the licensing agreement, Jacked Up would sell its energy ingredients to Sara Lee and Sara Lee would then manufacture and sell Jacked Up products. The parties agreed to share marketing costs. In addition, the agreement called for market testing. The initial term of the licensing agreement was five years, followed by a three-year

---

[1] "Dispensed" means that the beverage is distributed using stand-alone equipment rather than through a fountain machine or in bottles or cans.

2

renewal term. However, the licensing agreement featured a number of termination clauses triggered by various events and dates.

One termination provision, Section 14(b), gave either party "the right to terminate this Agreement if it provides written notice to the other party no later than 60 days prior to any anniversary of the Effective Date." Sara Lee proposed adding this termination provision while the parties were finalizing the agreement. In an email, Sara Lee referred to this provision as an "annual Termination clause" affording both parties "the ability to terminate if strategy changes or market conditions shift, etc." Jacked Up accepted the added provision, describing it as "adding limited right for either party to terminate at anniversary dates of agreement."

During negotiations, Sara Lee also requested a change-of-control termination provision (Section 14(c)). In an email, Sara Lee director of marketing Greg Immell explained that Sara Lee wanted this provision "in the event North American Beverage[2] is purchased by a third party company." Schmitz testified that this statement led him to question Sara Lee "executives Mr. Drake and Mr. Immell about any intent to sell the North American Beverage [Division]." According to Schmitz, these executives represented that Sara Lee "had no intent to sell the business and that it was not discussing any sale to any third party. They also represented that [Schmitz] did not need to be concerned as under no circumstance would [Sara Lee sell] the business and not include the License Agreement as part of the deal." Jacked Up and Sara Lee finalized the licensing agreement around September 28, 2011, with an effective date of October 1, 2011.

In early October 2011, shortly after the licensing agreement went into effect, Sara Lee displayed Jacked Up products at a convenience store trade

---

[2] This division was one of several under the Sara Lee corporate umbrella at the time. Jacked Up dealt primarily with employees of this division.

show. According to Schmitz, a Sara Lee worker at the show told him about an impending sale of the company. Schmitz testified that he again asked Sara Lee executives—Immell and director of sales Jim Whitaker—whether Sara Lee was planning a sale. The executives, according to Schmitz, again represented that Sara Lee was not selling its business.

On October 24, 2011, Sara Lee publicly announced the sale of its North American Beverage Division to Smucker; this sale closed in early 2012. According to Schmitz, Sara Lee asked him to participate in a telephone call around October 21, 2011.[3] On that call, according to Schmitz, Immell

> stated that [Sara Lee] was selling its coffee business to Smuckers, that the License Agreement would not be part of the [sale] to Smuckers, that [Sara Lee] was terminating the License Agreement immediately at Smuckers' request, that [Sara Lee] would no longer perform any obligations under the agreement, and that [Sara Lee] was discontinuing the Jacked Up Energy Iced Teas, Coffees, and Cappuccinos.

Schmitz testified that had he known of Sara Lee's impending sale to Smucker, he would not have signed the agreement and would not have launched Jacked Up products at the convenience store trade show.

Immell recounted the late October telephone call somewhat differently. According to Immell, he did tell Schmitz that Smucker would not assume the licensing agreement.[4] But he also indicated that "Sara Lee was interested in pushing forward with the proposed dispensed energy iced tea product pursuant to the License Agreement, including by pursuing the required market testing to see how a Jacked Up branded dispensed energy iced tea would fare in the marketplace." Schmitz refused to move forward with market testing, however.

---

[3] In an earlier declaration, Schmitz stated that this conversation took place on October 26, 2011.

[4] An internal Smucker email dated October 28, 2011, confirms that Smucker did not plan to assume Sara Lee's contract with Jacked Up.

Thus, according to Immell's account, it was Jacked Up that violated the agreement first.

In any event, the deal quickly broke down. An internal Sara Lee email dated October 26, 2011, suggests that Sara Lee had told Jacked Up by then that the licensing agreement would not come to fruition. An email from Sara Lee to Schmitz on November 4, 2011, further states that "Jacked Up Energy Tea is not part of [the] sale and will be discontinued." Sara Lee formally terminated the licensing agreement by letter on November 18, 2011.

As quickly as the licensing agreement broke down, it wound up in court. Jacked Up brought a breach of contract claim against Sara Lee in Texas state court on November 7, 2011—before Sara Lee even sent its formal termination letter. After Sara Lee removed the case to federal court, Jacked Up added Smucker as a defendant, claiming that Smucker tortiously interfered with the licensing agreement. Jacked Up later added claims for breach of fiduciary duty, fraud, and fraudulent inducement against Sara Lee, as well as a claim for common law trade secret misappropriation against Smucker. Jacked Up based this trade secret claim on the allegation that Smucker has used Jacked Up formulas in its Pickwick-brand iced teas (a brand it purchased from Sara Lee).

After discovery, all three parties moved for summary judgment. In connection with these motions, the parties moved to strike certain summary judgment evidence. Jacked Up also requested a continuance pursuant to Federal Rule of Civil Procedure 56(d) in response to Smucker's summary judgment motion, claiming that Smucker had not yet revealed what formula it was using in its teas. The district court granted Sara Lee's and Smucker's motions for summary judgment on various grounds, denied the motions to strike as moot, and denied Jacked Up's 56(d) request for a continuance. The district court entered judgment in favor of Sara Lee and Smucker on June 4, 2015. This appeal followed.

No. 15-11019

## II. JURISDICTION AND STANDARD OF REVIEW

Jacked Up is a limited liability company whose sole member—Joe Schmitz—is a Texas citizen. Sara Lee is a Maryland corporation with its principal place of business in Illinois. Smucker is an Ohio corporation with its principal place of business in Ohio. Therefore, the district court had diversity jurisdiction under 28 U.S.C. § 1332. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

We review de novo a district court's grant of summary judgment. *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 562 (5th Cir. 1996). The Court must view "the facts and inferences . . . in the light most favorable to the nonmoving party." *Id.* at 562–63. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Additionally, this Court reviews for abuse of discretion a district court's denial of a Rule 56(d) motion for a continuance. *Am. Family Life Assurance Co. of Columbus v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013).

## III. DISCUSSION

On appeal, Jacked Up argues that issues of fact preclude summary judgment on its breach of contract, breach of fiduciary duty, fraud, and fraudulent inducement claims against Sara Lee, as well as its tortious interference and trade secret claims against Smucker.

No. 15-11019

## A.   Claims Against Sara Lee

### 1. Breach of Contract

The district court concluded that Sara Lee terminated the contract in accordance with Section 14(b)'s plain language. Jacked Up challenges the district court's interpretation of Section 14(b), insisting that this provision is ambiguous. In response, Sara Lee defends the district court's interpretation of Section 14(b), and further argues that even if the district court misinterpreted this termination provision, Jacked Up fails to establish a breach of contract claim.

### a. Whether the district court misinterpreted the contract

The contractual provision at issue in this case is Section 14(b) of the licensing agreement, which states: "Either party shall have the right to terminate this Agreement if it provides written notice to the other party no later than 60 days prior to any anniversary of the Effective Date." The district court found this provision unambiguous. According to the district court, Section 14(b) permits at-will termination during a "10-month window every year." Because Sara Lee terminated the licensing agreement during one such window—i.e., more than 60 days before the first anniversary date—the court held that Sara Lee did not breach the contract.

Jacked Up provides two alternative interpretations of Section 14(b). In its principal brief on appeal, Jacked Up argues that the word "anniversary" in Section 14(b) means the end of the initial five-year term and the end of the subsequent three-year renewal term. Jacked Up also offered this interpretation before the district court. In its reply brief, Jacked Up argues that Section 14(b) creates an annual right to opt out of the contract.[5] In other

---

[5] Jacked Up did briefly refer to this interpretation in its principal brief on appeal: Barring an interpretation, which Sara Lee never advanced in the District Court, *that the clause was intended to provide for an annual right for unilateral*

words, "if a party gives notice 60 days prior to the anniversary of the Effective Date, the License Agreement terminates at the end of that calendar year. If neither party gives notice 60 days prior to the anniversary of the Effective Date, the License Agreement extends to another year."

The parties agree that Illinois law controls the breach of contract claim. Under Illinois law, "[t]he primary objective in construing a contract is to give effect to the intent of the parties." *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). A contract "is to be construed as a whole, giving effect to every provision, if possible." *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004). If words in the contract "are clear and unambiguous, they must be given their plain, ordinary, and popular meaning." *Id.* "But if the contract is ambiguous, 'its construction is then a question of fact, and parol evidence is admissible to explain and ascertain what the parties intended.'" *Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009) (quoting *Farm Credit Bank of St. Louis v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991)). Contractual language is ambiguous if it "is susceptible to more than one meaning." *Gallagher*, 874 N.E.2d at 58. Whether a contract is ambiguous is a question of law. *Quake Constr., Inc. v. Am. Airlines, Inc.*, 565 N.E.2d 990, 994 (Ill. 1990).

As an initial matter, the first interpretation offered by Jacked Up—that Section 14(b) only permits termination at the ends of the initial and renewal terms—is unreasonable. This interpretation ignores the clear and unambiguous meaning of "anniversary": "the *yearly* recurrence of the date of a past event." *Anniversary*, *Random House Webster's Unabridged Dictionary* (2d ed. 2001) (emphasis added). Thus, Section 14(b) unambiguously provides an annual right of termination.

---

*termination without cause*, the only other "anniversaries" in the Licensing Agreement are those described in the testimony of Jacked Up's principal, Mr. Schmitz.

No. 15-11019

The real interpretive question in this case is *when termination is effective*. Sara Lee argues, and the district court held, that termination under Section 14(b) is effective immediately. Jacked Up's second interpretation, by contrast, implies that termination is effective at the end of the year.[6] Both interpretations have some merit.

The plain language of Section 14(b) favors Sara Lee's interpretation. Section 14(b) simply affords each party "the right to terminate . . . if it provides written notice." The provision does not state that termination is effective at some later date. The provision could have been written differently; for example, Section 14(b) could read:

> Either party hereto may terminate this Agreement *as of the anniversary date of this Agreement* in any year by mailing written notice of its election to do so to the other party sixty (60) or more days before the effective date of such termination.

*Rockwell Eng'g Co. v. Automatic Timing & Controls Co.*, 559 F.2d 460, 462 (7th Cir. 1977) (emphasis added); *see also Int'l Adm'rs, Inc. v. Life Ins. Co. of N. Am.*, 753 F.2d 1373, 1382 (7th Cir. 1985) ("Either the Policyholder or the Company may terminate this policy on the first or any subsequent anniversary of the date of issue by written notice mailed or delivered to the other at least 30 days prior to the effective date of termination."). In the absence of such language, it is reasonable to read Section 14(b) as permitting termination as soon as one party provides written notice to the other.

But Sara Lee's interpretation has drawbacks. First, a provision that permits at-will termination ten months out of the year but not during the 60 days prior to October 1 makes little business sense. *See Bd. of Educ. of Waukegan Cmty. Unit Sch. Dist. No. 60 v. Orbach*, 991 N.E.2d 851, 857 (Ill. App. Ct. 2013) (explaining that "a contract should be construed to avoid absurd

---

[6] This could mean at the end of the calendar year, as Jacked Up suggests, or on the anniversary date, October 1.

results"). Second, reading the contract as providing at-will termination would largely nullify the contract's other termination provisions in Sections 7 and 14. *See Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011) ("A court will not interpret a contract in a manner that would nullify or render provisions meaningless . . . ."). These other provisions permit termination upon 30, 60, or 90 days' notice if certain events occur. But if a party can terminate immediately under Section 14(b), then it need not rely on these other provisions.

Sara Lee's weaknesses are Jacked Up's strengths. Jacked Up's interpretation makes business sense: it gives each party an annual opportunity to opt out of the licensing agreement and gives the other party at least 60 days to wind down its commitments under the agreement.[7] Moreover, this limited interpretation does not nullify the contract's other termination provisions. Indeed, Jacked Up's interpretation accords with the plain meaning of the other termination provisions in the licensing agreement, all of which make termination effective some period of time after notice is provided.

On balance, we find Section 14(b) ambiguous because the text is silent about when termination is effective. Setting aside context, Sara Lee's interpretation is more natural than Jacked Up's. But the text is not so "clear and unambiguous," *Cent. Ill. Light*, 821 N.E.2d at 213, that we must read the provision as making termination effective immediately. By contrast, Jacked Up's interpretation is more reasonable in context, but it does read words into the contract that are not present. "[C]onstru[ing] the contract as a whole [and] reading each term in light of the others," *Bank of Am. Nat'l Trust & Sav. Ass'n v. Schulson*, 714 N.E.2d 20, 24 (Ill. App. Ct. 1999), Section 14(b) is susceptible

---

[7] Sara Lee itself explained the purpose of Section 14(b) in an email dated September 26, 2011: to afford both parties "the ability to terminate if strategy changes or market conditions shift, etc." This email also describes Section 14(b) as permitting "[t]ermination with 60 days notice." We do not consider this parol evidence in determining whether Section 14(b) is ambiguous, but the district court may consider it on remand.

No. 15-11019

to both Sara Lee's and Jacked Up's interpretations. Accordingly, Section 14(b) is ambiguous, "its construction is . . . a question of fact, and parol evidence is admissible to explain and ascertain what the parties intended." *Curia*, 587 F.3d at 829 (quoting *Whitlock*, 581 N.E.2d at 667). We reverse the district court's conclusion that Section 14(b) unambiguously permitted Sara Lee to terminate the licensing agreement at will.

### b. Whether Sara Lee breached the contract

Under Illinois law, a breach of contract claim requires "evidence of (1) the existence of a contract; (2) [the plaintiff's] performance under the contract; (3) the defendants' breach; and (4) resulting injury from the breach." *Burrell v. City of Mattoon*, 378 F.3d 642, 651 (7th Cir. 2004). Because the district court interpreted Section 14(b) as permitting at-will termination, it held that Sara Lee's termination did not breach the licensing agreement. On appeal, the parties dispute whether Sara Lee breached the contract even if the district court's interpretation is incorrect. The parties appear to agree that the licensing agreement was a valid contract, but Sara Lee contests the other three elements of Jacked Up's breach of contract claim.[8] First, Sara Lee argues that it did not breach the contract prior to its formal termination on November 18, 2011. Second, Sara Lee argues that Jacked Up failed to perform its end of the contract by refusing to conduct market testing. In response, Jacked Up argues that Sara Lee repudiated first, thereby relieving Jacked Up of any further duties under the contract.

Both parties can point to evidence in the record supporting their respective positions on who repudiated first. Specifically, both parties cite to contrasting accounts of a telephone conversation in late October 2011. According to Sara Lee's Greg Immell, he told Schmitz during that conversation

---

[8] We discuss Jacked Up's performance and Sara Lee's breach here, and damages in Part III.C below.

11

No. 15-11019

that "Sara Lee was interested in pushing forward with the proposed dispensed energy iced tea product pursuant to the License Agreement." By contrast, according to Schmitz, Immell represented that Sara Lee "was terminating the License Agreement immediately at Smuckers' request." Schmitz's account is corroborated by an internal Sara Lee email dated October 26, 2011, suggesting that Immell had told Schmitz that the licensing agreement would be terminated and that Schmitz "was not too happy."

If the district court's interpretation of Section 14(b) is incorrect, and Sara Lee did "manifest[] a clear, unequivocal intent not to perform under the contract when performance [was] due," then it anticipatorily breached the contract. *Arlington LF, LLC v. Arlington Hosp., Inc.*, 637 F.3d 706, 713 (7th Cir. 2011). But if Sara Lee did not repudiate the agreement and Schmitz refused to conduct market testing, then Jacked Up failed to perform. Because evidence in the record supports both positions, there are genuine disputes about whether Sara Lee breached the contract and whether Jacked Up performed under the contract. Accordingly, we reverse the district court's grant of summary judgment in favor of Sara Lee on Jacked Up's breach of contract claim.

### 2. Breach of Fiduciary Duty

The district court granted summary judgment on Jacked Up's breach of fiduciary duty claim, finding that Sara Lee did not owe any fiduciary duty to Jacked Up. On appeal, the parties dispute whether there is a fact issue as to the existence of a fiduciary relationship. *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992) ("The existence of a confidential relationship is usually a question of fact."). Jacked Up argues that its "'partner' relationship" with Sara Lee and the non-disclosure agreement ("NDA") both parties signed created a fiduciary relationship between them. Sara Lee argues that the parties dealt with each other at arm's

12

length and notes that neither an NDA nor one party's subjective trust in the other suffices to create fiduciary duties. Sara Lee also emphasizes that the licensing agreement itself disclaims a fiduciary relationship.

Under Texas law,[9] "[t]he elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied)). "A fiduciary relationship may arise from formal and informal relationships and may be created by contract." *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, no pet.). "[A] formal fiduciary relationship[] 'arises as a matter of law and includes the relationships between attorney and client, principal and agent, partners, and joint venturers.'" *Navigant Consulting*, 508 F.3d at 283 (quoting *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex. App.—Houston [1st Dist.] 2003, no pet.)). An informal fiduciary relationship, however, "may arise where one person trusts in and relies upon another, whether the relationship is a moral, social, domestic, or purely personal one." *Id.* (quoting *Jones*, 196 S.W.3d at 449). In other words, a fiduciary relationship "exists where a special confidence is reposed in another who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Tex. Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980) (quoting *Lappas v. Barker*, 375 S.W.2d 248, 251 (Ky. 1964)).

But Texas law "does not recognize a fiduciary relationship lightly," *Lundy*, 260 S.W.3d at 501, "especially in the commercial context," *Willis v.*

---

[9] The district court held, and the parties agree, that Texas law applies to Jacked Up's extra-contractual claims against Sara Lee.

No. 15-11019

*Donnelly*, 199 S.W.3d 262, 278 (Tex. 2006). "To impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit." *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 288 (Tex. 1998).

As Sara Lee notes, licensing agreements generally do not create fiduciary relationships. *See, e.g.*, *Wellogix, Inc. v. Accenture, LLP*, 788 F. Supp. 2d 523, 545–46 (S.D. Tex. 2011) (finding that licensing agreement was an arm's-length transaction); *Hollomon v. O. Mustad & Sons (USA), Inc.*, 196 F. Supp. 2d 450, 458–59 (E.D. Tex. 2002) (finding that royalty agreement did not create a fiduciary relationship). Neither do NDAs or other agreements requiring confidentiality. *See, e.g.*, *Anglo-Dutch Petroleum Int'l, Inc. v. Smith*, 243 S.W.3d 776, 782 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("To the extent Smith's position equates a confidentiality agreement to a relationship of trust and confidence giving rise to a fiduciary duty, he has cited, and we have found, no authority supporting the notion that confidentiality agreements can create fiduciary relationships."); *Wellogix*, 788 F. Supp. 2d at 546 (finding that an NDA did not give rise to a fiduciary relationship). Additionally, "mere subjective trust alone is not enough to transform arm's-length dealing into a fiduciary relationship." *Crim Truck*, 823 S.W.2d at 595 (quoting *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962)).

Jacked Up suggests that it created a partnership with "dominant partner" Sara Lee. But the licensing agreement itself makes clear that it "does not, and shall not, be deemed to make any party hereto the agent, partner, joint venturer or legal representative of any other party for any purpose whatsoever." Furthermore, Jacked Up fails to cite any authority for the proposition that a dominant party in a commercial transaction, where each party is represented by counsel, owes fiduciary duties to the weaker party.

Jacked Up also argues that "the collaborative effort to develop the products, the joint marketing efforts, . . . and the promises of a long-term deal all would permit a reasonable juror to find the existence of a fiduciary relationship." Such corporate dealings do not transform an arm's length transaction into a fiduciary relationship. *See Wellogix*, 788 F. Supp. 2d at 545 ("The Mutual Nondisclosure Agreement, the Marketing Alliance Agreement, [and] the two Teaming Agreements were all agreements between Accenture and Wellogix to jointly exchange information with each other in order to develop business opportunities to which both would contribute particular expertise and from which both would benefit. As such, these agreements are 'arms-length transactions entered into for the parties' mutual benefit, and thus do not establish a basis for a fiduciary relationship.'" (quoting *Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005))).

In sum, Jacked Up fails to point to sufficient evidence that would support finding a fiduciary relationship between the parties. Therefore, we affirm the district court's grant of summary judgment in favor of Sara Lee on Jacked Up's breach of fiduciary duty claim.

### 3. *Fraud and Fraudulent Inducement*

Jacked Up's claims for fraud and fraudulent inducement both rely on a series of alleged misrepresentations. But the district court granted summary judgment in favor of Sara Lee on these two claims for different reasons. On the fraud claim, the district court held that Jacked Up pleaded *constructive*, rather than common law,[10] fraud. Constructive fraud, like breach of fiduciary duty, requires the existence of a fiduciary relationship. *See Hubbard v. Shankle*, 138 S.W.3d 474, 483 (Tex. App.—Fort Worth 2004, pet. denied). Because Sara Lee

---

[10] Note that courts sometimes refer to "common law" fraud as "actual" fraud. *See, e.g.*, *Flanary v. Mills*, 150 S.W.3d 785, 795 (Tex. App.—Austin 2004, pet. denied).

did not owe fiduciary duties to Jacked Up, the district court granted summary judgment in favor of Sara Lee on the fraud claim. On the fraudulent inducement claim, the district court first found that several alleged misrepresentations contradicted the terms of the licensing agreement and therefore cannot support a fraudulent inducement claim as a matter of law. Second, the district court found that Jacked Up's reliance on other alleged misrepresentations was unjustified.

### a. Whether Jacked Up pleaded common law fraud

On appeal, Jacked Up first challenges the district court's holding that Jacked Up pleaded only constructive fraud. Common law fraud and constructive fraud "are independent causes of action." *Phillips v. United Heritage Corp.*, 319 S.W.3d 156, 167 (Tex. App.—Waco 2010, no pet.). The elements of common law fraud are (1) "a material misrepresentation" that (2) "was false," (3) "was either known to be false when made or was asserted without knowledge of its truth," (4) "was intended to be acted upon," (5) "was relied upon," and (6) "caused injury." *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) (quoting *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998)). Constructive fraud is "the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship." *Hubbard*, 138 S.W.3d at 483.

As an initial matter, the district court did err by applying Texas state law on general and specific allegations. Under federal procedural law, a plaintiff must "give fair notice in the pleadings of all claims brought against the defendant." *Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 402 (5th Cir. 2013). "So long as a pleading alleges facts upon which relief can be granted," however, "it states a claim even if it 'fails to categorize correctly the legal theory giving rise to the claim.'" *Id.* (quoting *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 604 (5th Cir. Nov. 1981)). For example, this Court read the plaintiff's

16

pleading of an implied warranty claim under California law as a similar claim under Texas law, noting that "the most natural reading of the [plaintiffs'] broadly-worded complaint would include *some* version of that claim under Texas law." *McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, 551 (5th Cir. 2003). However, this Court has also held that "district courts do not abuse their discretion when they disregard claims or theories of liability not present in the complaint and raised first in a motion opposing summary judgment." *De Franceschi v. BAC Home Loans Servicing, L.P.*, 477 F. App'x 200, 204 (5th Cir. 2012) (unpublished).

Jacked Up's fraud claim as articulated in its complaint is consistent with constructive fraud. Specifically, the complaint refers to Sara Lee as a trusted vendor and fiduciary that abused its position of trust and "violated the confidences bestowed upon [it]."

But the complaint is not clearly inconsistent with common law fraud. The relevant section is titled "Fraud (Against SL)" and mentions "the Defendant's knowing, reckless, and intentional deception." Moreover, the allegations made in the fraudulent inducement section of the complaint support Jacked Up's common law fraud claim. Thus, "the most natural reading of [Jacked Up's] broadly-worded complaint would include" common law fraud. *McManus*, 320 F.3d at 551. In addition, Jacked Up's fraud and fraudulent inducement arguments are essentially identical both on appeal and in the summary judgment briefing. Given the ambiguity in Jacked Up's complaint and the similarities between Jacked Up's fraud and fraudulent inducement arguments, we find that Jacked Up gave "fair notice in the pleadings of all claims brought against the defendant." *Homoki*, 717 F.3d at 402. Therefore, the district court erred in granting summary judgment on Jacked Up's fraud claim on this ground.

17

### b. Whether Jacked Up's reliance on Sara Lee's representations was justified

Jacked Up next argues that genuine issues of material fact preclude summary judgment on its fraud and fraudulent inducement claims. Sara Lee contends, as the district court held, that Jacked Up's reliance on Sara Lee's alleged misrepresentations was not justifiable.

"The issue of justifiable reliance is generally a question of fact." *Prize Energy Res., L.P. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 584 (Tex. App.—San Antonio 2011, no pet.). But "[i]t is well-established that '[t]he recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him.'" *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 424 (Tex. 2015) (quoting Restatement (Second) of Torts § 541 (Am. Law. Inst. 1977)). "Moreover, 'a person may not justifiably rely on a representation if there are "red flags" indicating such reliance is unwarranted.'" *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) (quoting *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003)).

On appeal, Jacked Up identifies several misrepresentations by Sara Lee. As the district court found, some of these representations were clearly contradicted by the licensing agreement itself. Sara Lee's representation that Jacked Up would recoup its development costs several times over was contradicted by the fact that the licensing agreement merely set out royalty rates based on net sales. Similarly, Sara Lee's representation that it would not terminate the contract was contradicted by the numerous termination provisions in the contract. Jacked Up could not justifiably rely on these "oral misrepresentations regarding the contract's unambiguous terms." *Westergren*, 453 S.W.3d at 424.

No. 15-11019

Jacked Up's strongest argument for fraud and fraudulent inducement is based on Sara Lee's alleged representations that it was not planning to sell its beverage division. Jacked Up claims it continued to develop products as well as negotiated and signed the licensing agreement in reliance on these representations. The district court found that Jacked Up's reliance on these representations was unjustifiable because of another representation that Sara Lee made: that Sara Lee wanted to add the change-of-control termination provision at Section 14(c) "in the event North American Beverage is purchased by a third party company."

Jacked Up surely knew that Sara Lee might sell its beverage division in the future. But this fact does not make Sara Lee's other representation—that it was not *currently* planning to sell the company—obviously false. *See Westergren*, 453 S.W.3d at 424.

Whether Sara Lee's explanation for why it wanted a change-of-control termination provision constituted a "red flag" is a closer question. Sara Lee cites several cases where reliance was unjustifiable based on some sort of red flag. In *Grant Thorton*, the Texas Supreme Court held that reliance on a company's audit reports to purchase the company's bonds was unjustifiable after the plaintiff learned that the company "had lost its primary source of funding." 314 S.W.3d at 923. This fact was a red flag that contradicted the rosier picture painted by the earlier audit reports. *Id.* In *Lewis*, this Court examined the plaintiff's reliance on an oral representation by the defendant about the tax consequences of a transaction. 343 F.3d at 546–47. Documents prepared by the defendant in *Lewis* did not mention the tax consequences of the transaction or characterize the instruments at issue as tax-deferred. *Id.* at 547. This Court held that these documents were "a red flag warranting further investigation of the tax consequences of the loan transaction." *Id.* In *Skelton v. Urban Trust Bank*, 516 B.R. 396 (N.D. Tex. 2014), a district court addressed

whether a plaintiff justifiably relied on the defendant's representation that it possessed a promissory note. The plaintiff in that case was aware of an affidavit executed by the defendant which indicated that the note was lost. *Id.* at 398. The court found that this lost note affidavit was a red flag that rendered reliance unjustifiable. *Id.* at 406.

Sara Lee's explanation for why it wanted a change-of-control termination provision was not as much of a red flag as the defendants' actions in *Grant Thorton*, *Lewis*, and *Skelton*. Merely suggesting the possibility of selling the beverage division did not "serve as a warning," *In re Mercer*, 246 F.3d 391, 418 (5th Cir. 2001) (quoting William Prosser, *Law of Torts* § 108 (4th ed. 1971)), that Sara Lee was actively planning a sale. Even if it were such a warning, Jacked Up could not have learned the truth with reasonable investigation. Schmitz did the only thing he could to investigate—he asked Sara Lee executives whether they currently planned to sell the company. Sara Lee does not suggest that Jacked Up could have learned of the sale in some other way. Indeed, the sale was not made public until late October.

A more comparable case is *In re Whittington*, 530 B.R. 360 (Bankr. W.D. Tex. 2014). There, the plaintiff was confronted with a red flag—"a partially redacted contract with numbers that did not quite add up." *Id.* at 385. The plaintiff asked the defendant "whether he was making side profits on the deal"; the defendant "lied in response." *Id.* The court found that there was nothing obvious about this lie "that should have triggered further inquiry, nor was there any reason" to distrust the defendant. *Id.* Likewise, in this case there was nothing obviously false about Sara Lee's representation that it was not planning to sell its beverage division, nor did Jacked Up have any reason to distrust Sara Lee.

At the very least, there is a genuine dispute of fact as to whether Jacked Up's reliance on Sara Lee's representations was justifiable. Therefore, we

reverse the district court's grant of summary judgment in favor of Sara Lee on the fraud and fraudulent inducement claims.

## B.    Claims Against Smucker

### 1. Tortious Interference with a Contract

The district court granted summary judgment in favor of Smucker on Jacked Up's tortious interference claim on the ground that Sara Lee did not breach the licensing agreement.[11] Jacked Up argues on appeal that genuine issues of material fact preclude summary judgment on its tortious interference claim. In response, Smucker first argues that no evidence supports a finding that Smucker caused Sara Lee to breach the contract. Second, Smucker argues that its actions were privileged under Illinois law.

As an initial matter, Jacked Up applies Texas law while Smucker applies Illinois law to the tortious interference claim. The district court applied Texas law but did not conduct a choice of law analysis. Although Texas and Illinois laws are slightly different in this context, the difference is not material. Accordingly, no choice of law analysis is necessary. *See Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002) ("If the laws of the states do not conflict, then no choice-of-law analysis is necessary." (quoting *W.R. Grace & Co. v. Cont'l Cas. Co.*, 896 F.2d 865, 874 (5th Cir. 1990))).

Under Illinois law, a tortious interference claim has the following elements: "(1) there was an enforceable contract; (2) the defendant was aware of that contract; (3) the defendant intentionally and unjustifiably induced a breach of the contract; (4) breach resulted from the defendant's wrongful conduct; and (5) the plaintiff has been damaged." *Marathon Fin. Ins. v. Ford Motor Co.*, 591 F.3d 458, 466 (5th Cir. 2009) (citing *Smock v. Nolan*, 361 F.3d 367, 372 (7th Cir. 2004)). Illinois "[c]ourts will recognize a privilege in

---

[11] Because we find that there is a genuine dispute as to whether Sara Lee breached the agreement, we cannot affirm the district court on this ground.

intentional interference with contract cases where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights."[12] *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 677 (Ill. 1989). If a defendant's conduct is privileged under Illinois law, then "it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious." *Williams v. Shell Oil Co.*, 18 F.3d 396, 402–03 (7th Cir. 1994).

Similarly, Texas law requires "(1) an existing contract subject to interference [and] (2) a willful and intentional act of interference with the contract[] (3) that proximately caused the plaintiff's injury[] and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). Privilege or justification is a complete defense to liability. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689–90 (Tex. 1989) (noting that "[t]he party asserting this privilege does not deny the interference but rather seeks to avoid liability based upon a claimed interest that is being impaired or destroyed by the plaintiff's contract"). "A party is privileged" under Texas law "to interfere with the contractual relations of another if: (1) it acts in the bona fide exercise of its own rights, or (2) the interfering party has an equal or superior right in the subject matter to that of the party to the contract." *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 857 (Tex. App.— Houston [14th Dist.] 2001, pet. denied) (citing *Prudential Ins.*, 29 S.W.3d at 80).

Jacked Up essentially points to two acts of interference by Smucker. First, Smucker requested that Sara Lee terminate the licensing agreement. If

---

[12] Illinois courts sometimes use this same language to determine whether the defendant's interference was justified as part of the prima facie case for tortious interference. *See Nation v. Am. Capital, Ltd.*, 682 F.3d 648, 651 n.2 (7th Cir. 2012) (explaining this confusion); *Roy v. Coyne*, 630 N.E.2d 1024, 1035 (Ill. App. Ct. 1994) (quoting this language in the context of justifiability).

this were true, then Jacked Up would seem to have a strong prima facie claim of tortious interference under either Illinois or Texas law. In support of this act of interference, Jacked Up points to Schmitz's declaration, which states that around October 21, 2011, Sara Lee's Greg Immell told him on a telephone call that Sara Lee was "terminating the License Agreement immediately at Smuckers' request." Smucker's instruction to Sara Lee would be admissible as an opposing party's statement. *See* Fed. R. Evid. 801(d)(2)(D) (a statement is not hearsay if "offered against an opposing party and . . . made by the party's agent or employee on a matter within the scope of that relationship and while it existed"). But Immell himself was not an employee of Smucker at that time; thus, his statement relaying Smucker's instruction appears to be hearsay not subject to any exception. *See* Fed. R. Evid. 805 (hearsay within hearsay is only admissible "if each part of the combined statements conforms with an exception to the rule"). Moreover, Jacked Up offers no "equivalent circumstantial guarantees of trustworthiness" to introduce this statement under the residual exception to the hearsay rule. Fed. R. Evid. 807(a)(1). Accordingly, Schmitz's declaration is inadmissible against Smucker to show that Smucker intentionally caused Sara Lee to terminate the contract.

Second, Jacked Up argues that Smucker induced Sara Lee to terminate the contract by opting not to assume the licensing agreement when it purchased Sara Lee's beverage division. Smucker argues that its decision was justified. Specifically, Smucker's corporate deponent explained that Jacked Up's brand was not a good fit with Smucker's "family-friendly, family-oriented" image. In an email dated October 28, 2011, a Smucker vice president also explained that Smucker did not "want this contract as a means to enter the energy drink business. We will have our hands full successfully integrating the new [Sara Lee] businesses into our portfolio." This evidence supports a finding that Smucker made its decision "based on business considerations," *Marathon*

*Fin. Ins.*, 591 F.3d at 468 (applying Illinois law), "in the bona fide exercise of its own rights," *Baty*, 63 S.W.3d at 857 (applying Texas law).

Jacked Up cites no Illinois or Texas case where a defendant unjustifiably interfered with a plaintiff's contract merely by purchasing some of a third-party's assets and declining to assume the third party's contract with the plaintiff. To the contrary, a defendant in Smucker's position would ordinarily be justified in assuming some contracts but not others as part of an asset purchase. Indeed, one court has found that in the context of a tortious interference claim, Texas law affords a privilege to a party purchasing assets from a corporation. *C.M. Asfahl Agency v. Tensor, Inc.*, 135 S.W.3d 768, 791–92 (Tex. App.—Houston [1st Dist.] 2004, no pet.). Because no evidence or case law supports the finding that Smucker's actions were unjustified, we affirm summary judgment in favor of Smucker on the tortious interference claim.

### 2. *Trade Secret Misappropriation*

The district court held that the Ohio Uniform Trade Secrets Act ("UTSA"), Ohio Rev. Code § 1333.61–.69, preempts Jacked Up's common law trade secret claim, and denied Jacked Up's Rule 56(d) request for a continuance. On appeal, Jacked Up argues that Texas law applies and that the district court abused its discretion by denying its Rule 56(d) request. Smucker defends the district court's decision and also argues that Jacked Up has failed to put forth sufficient evidence in support of a trade secret claim.

The district court conducted an extensive choice of law analysis and found that Ohio law governs this claim. Courts "apply the law of the forum state to determine which state's law applies." *Mumblow v. Monroe Broad., Inc.*, 401 F.3d 616, 620 (5th Cir. 2005). Under the "most significant relationship" test used by Texas courts,

> The factors to consider in determining the applicable law for a tort case such as this are (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the

residence, nationality, and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered.

*In re ENSCO Offshore Int'l Co.*, 311 S.W.3d 921, 928 (Tex. 2010) (citing Restatement (Second) of Conflict of Laws § 145 (Am. Law. Inst. 1971)). In trade secret misappropriation cases, "the place of injury does not play so important a role"; "[i]nstead, the principal location of the defendant's conduct is the contact that will usually be given the greatest weight." Restatement (Second) of Conflict of Laws § 145 cmt. f. Thus, in this case, the fact that Smucker allegedly misappropriated a trade secret in Ohio is more important than the fact that Jacked Up suffered its injury in Texas. The third factor weighs equally in favor of Texas and Ohio law because Jacked Up is a Texas citizen and Smucker is an Ohio citizen. The fourth factor is not particularly applicable because Jacked Up and Smucker never had any formal relationship. On balance, we agree with the district court that Ohio has the most significant contacts with this claim and that no countervailing policy considerations weigh against this conclusion. Therefore, we apply Ohio law to Jacked Up's trade secret claim.

Ohio's UTSA provides a remedy for "misappropriation." Ohio Rev. Code § 1333.63. Misappropriation is defined, among other things, as "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," Ohio Rev. Code § 1333.61(B)(1), or "use of a trade secret of another without the express or implied consent of the other person by a person who . . . [u]sed improper means to acquire knowledge of the trade secret," Ohio Rev. Code § 1333.61(B)(2).

Jacked Up fails to put forth evidence showing that Smucker has acquired or used any trade secret. The core of Jacked Up's trade secret claim is that Smucker is using Jacked Up's formulas for its Pickwick- and Infusia-brand iced teas. Smucker contends that its four iced tea flavors were developed by Sara

25

Lee and mixed by Beverage House, Inc. ("Beverage House") before Sara Lee came into contact with Jacked Up. The record supports Smucker's account. For example, a declaration by a Beverage House representative states that Beverage House mixes the same iced tea flavors and the same energy component (XR16817000) for Smucker as it did for Sara Lee in 2010. This energy component differs from the one developed by Jacked Up. Additionally, a recent production batch sheet shows that Beverage House continues to use the XR16817000 energy component in the Raspberry Infusia Iced Tea.

Recognizing that it lacks evidence in support of its trade secret claim, Jacked Up seeks additional time for discovery under Rule 56(d). Rule 56(d) allows a court to deny a summary judgment motion and extend discovery if the party opposing summary judgment "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). "While Rule 56(d) motions for additional discovery are broadly favored and should be liberally granted, the party filing the motion must demonstrate how additional discovery will create a genuine issue of material fact." *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 422–23 (5th Cir. 2016) (citations and internal quotation marks omitted). In particular, the party opposing summary judgment "must 'set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion.'" *Biles*, 714 F.3d at 894 (quoting *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010)). That party must also have "diligently pursued discovery." *McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 700 (5th Cir. 2014) (quoting *Beattie v. Madison Cty. Sch. Dist.*, 254 F.3d 595, 606 (5th Cir. 2001)).

The district court found that Jacked Up failed to submit an affidavit in support of its Rule 56(d) motion and failed to show that it diligently pursued

discovery. On appeal, Jacked Up argues that it needs "documents regarding the formulas [Smucker] is using for its new energy tea." But the record already reflects that Smucker is using formulas developed by Sara Lee in 2010. Additionally, Jacked Up does not show that it diligently pursued discovery. Jacked Up did not move to compel production of these documents during the discovery period—the first time it sought judicial assistance in obtaining these documents was in response to Smucker's summary judgment motion. Under these circumstances, the district court did not abuse its discretion by denying Jacked Up's Rule 56(d) motion for a continuance. *Cf. Beattie*, 254 F.3d at 606 (affirming denial of Rule 56(d) motion where plaintiff failed to depose certain defendants during discovery period).

Because Jacked Up has failed to put forth evidence showing that Smucker acquired or used any trade secret, we affirm the district court's grant of summary judgment in favor of Smucker on the trade secret misappropriation claim. Additionally, we affirm the district court's denial of Jacked Up's Rule 56(d) motion for a continuance.

## C.     **Whether Jacked Up Can Prove Damages**

Finally, Sara Lee and Smucker urge the Court to affirm summary judgment on an alternative ground: that Jacked Up's evidence of lost profits is speculative.[13] Jacked Up's evidence of lost profits—an expert report prepared by EJ Janik ("Janik Report")—is critical to its claim for damages. Indeed, this expert report is the only evidence of damages in the record.[14]

---

[13] Although the defendants presented this argument below, the district court disposed of each claim on other grounds and did not address whether Jacked Up can prove damages. We may affirm summary judgment on this ground even though the district court did not address it. *See Culbertson v. Lykos*, 790 F.3d 608, 627 (5th Cir. 2015).

[14] Jacked Up likely could have claimed reliance damages. *See, e.g.*, Restatement (Second) of Contracts § 349 (Am. Law. Inst. 1981) ("As an alternative to [expectation damages], the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered

No. 15-11019

Sara Lee and Smucker principally argue that Illinois law bars recovery of lost profits by new businesses. Generally, Illinois "courts consider evidence of lost profits in a new business too speculative to sustain the burden of proof." *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 856 N.E.2d 389, 407 (Ill. 2006). This "new business rule" also applies "to new product lines in established businesses when profits are difficult to measure." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 633 (7th Cir. 2007). Texas courts apply a similar rule. *See Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994) ("Profits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and unproven enterprise, cannot be recovered."). This rule is not ironclad, however. *See, e.g.*, *Tri-G*, 856 N.E.2d at 407–08 (upholding jury's award of new business's lost profits based on comparable profits made by an established business). Indeed, the new business rule is simply an extension of the general rule that lost profits are only "recoverable if proved to a reasonable degree of certainty." *TAS Distrib.*, 491 F.3d at 632; *accord Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 278 (Tex. 2015) ("[L]ost profits can be recovered only when the amount is proved with reasonable certainty.").

The Janik Report calculates lost profits by projecting future sales of Jacked Up products. These sales figures assume that a certain number of stores would buy Jacked Up tea, coffee, and cappuccino each year and that each store would buy a certain number of cases of Jacked Up products. The Janik Report pulls these assumptions from Sara Lee's own internal projections.

had the contract been performed."). Although counsel for Jacked Up stated at oral argument that Jacked Up does have reliance damages, such damages are not substantiated in the record or explained in Jacked Up's briefs.

Jacked Up neither explains why these numbers are reasonably certain nor points to any evidence in the record substantiating them—perhaps partly because Sara Lee had no contracts with convenience stores to provide Jacked Up products by the time it terminated the licensing agreement, although 7-Eleven did pursue such a contract.

We leave it to the district court to determine whether Jacked Up has put forth sufficient evidence of damages. The district court may choose to conduct a *Daubert* inquiry to determine whether the Janik Report is admissible. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993) (suggesting that Federal Rule of Evidence 702 demands "more than subjective belief or unsupported speculation"); *see also Sportsband Network Recovery Fund, Inc. v. PGA Tour, Inc.*, 136 F.3d 1329 (5th Cir. 1998) (unpublished table decision) (affirming district court's application of both *Daubert* and Texas state law to a lost profits claim). Indeed, Sara Lee and Smucker moved to exclude the Janik Report, and this motion was still pending when the district court granted summary judgment. We leave it to the district court to determine whether the Janik Report is admissible, and if it is admissible, whether it establishes lost profits with reasonable certainty.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings.