**FIFTH DIVISION**
**MERCIER, C. J.,**
**MCFADDEN, P. J., and RICKMAN, J.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**July 17, 2024**

# In the Court of Appeals of Georgia

A24A0618. BE OUR GUEST INVESTMENTS, LLC v.
PIEDMONT PARK CONSERVANCY, INC.

MERCIER, Chief Judge.

Be Our Guest Investments, LLC ("BOG") appeals from the trial court's order granting partial summary judgment to Piedmont Park Conservancy, Inc. ("the Conservancy") in this contract dispute. For reasons that follow, we vacate the grant of partial summary judgment and remand for further proceedings.

Summary judgment is appropriate when no genuine issues of material fact remain and the moving party is entitled to judgment as a matter of law. See *Johnson County School Dist. v. Greater Savannah Lawn Care*, 278 Ga. App. 110, 111 (629 SE2d 271) (2006). We review the grant of summary judgment de novo, construing the

evidence and all reasonable inferences drawn from it in the light most favorable to the non-moving party. See id.

So viewed, the evidence shows that at the time of this dispute, the Conservancy owned the Piedmont Park Community Center, a building at the entrance to Piedmont Park that housed the Conservancy's environmental education camp and several restaurants. Through an entity known as G&M Acquisition Group, LLC ("GMA"), Katherine Drolett and David Duley, via individual limited liability corporations, owned The Nook, a popular and successful restaurant that had been in operation since 2008.[1] The Nook was located across the street from Piedmont Park, approximately two blocks from the Community Center.

When two Community Center restaurant spaces became available in 2014, the Conservancy asked The Nook's management team to submit a lease proposal for the spaces. The team prepared a proposal and was one of the final four candidates, but the Conservancy initially selected another option for the restaurant spaces. That option ultimately fell through, and the Conservancy requested that The Nook team resubmit

---

[1] A third individual, George Egerton, was also a profit sharing owner of the Nook.

its proposal in August 2016. After considering several submissions, the Conservancy awarded the lease opportunity to The Nook team in early 2017.

The team's proposal called for operation of two restaurants in the Community Center: a full service, American bistro-style restaurant called Walker's 1834, and a grab-and-go concept to be called Soulshine. According to Drolett, the plan was for Walker's 1834 and Soulshine to "share the same successful ownership and management team as The Nook," sell similar products as The Nook, and offer some of the same menu items originally developed for The Nook. Particularly with respect to Walker's 1834, the proposal described the new venture as an "expansion" by The Nook's management team.

With Drolett as the managing member and Duley as a minority owner, BOG was established as a single-purpose entity to develop, own, and operate Walker's 1834 and Soulshine. On June 15, 2017, BOG and the Conservancy entered into a lease agreement for BOG to rent the spaces at the Community Center for the new restaurants. The Conservancy delivered the leased property to BOG in "as is," "base building" condition, with BOG having responsibility for designing and finishing out the spaces as necessary subject to the Conservancy's design approval. The lease

required BOG to substantially complete construction "on or before three hundred (300) days after [the Conservancy] approves [BOG's] Plans and Specifications." The lease further provided that BOG would be in default if it failed to complete the work and begin restaurant operations "within three hundred sixty (360) days (as extended by any delay attributable to an Event of Force Majeure)" after the Conservancy approved the design. Under the lease, the Conservancy was charged with keeping "the exterior walls . . . , the foundations and roof of the Building in good and tenantable repair, provided that [BOG] shall give [the Conservancy] written notice of the necessity for such repairs[.]"

Construction commenced in June 2018, with an anticipated duration of 16 weeks to build out both restaurants. On July 11, 2018, BOG's general contractor, JM Williams ("JMW"), cut into the concrete slab foundation of the Soulshine location to install new plumbing As JMW continued its work, the slab collapsed and fell into a large sinkhole beneath the floor. BOG informed the Conservancy about the sinkhole and also contacted the project's geotechnical engineering firm, which evaluated the situation and recommended further investigation. The project's structural engineering firm also recommended additional investigation to determine the cause and extent of

the sinkhole, noting that voids could exist under other portions of the building slab, potentially impacting the structural integrity of the entire building and its systems. BOG provided the geotechnical and structural engineering reports to the Conservancy.

Although BOG requested that JMW lead the sinkhole inquiry, the Conservancy asked the City of Atlanta to investigate whether the void resulted from issues with an old sewer line running beneath the Community Center. The Conservancy and the City took over the investigation, and BOG understood that it should not investigate further or conduct any repairs in the Soulshine space. BOG continued construction on the Walker's 1834 space, which was located on the other side of the Community Center, away from the sinkhole, with the caveat that it would stop construction if its team concluded that the site was unsafe.

On September 7, 2018, JMW informed BOG that the sinkhole was "definitely growing." BOG reported the growth to the Conservancy, noting JMW's concern regarding the structural integrity of the Community Center and fear that the City might condemn the building. BOG also advised the Conservancy that its lender and insurance agent had instructed BOG "to stop construction immediately, pending

repair of the sinkhole and certification from the City that the building is structurally sound."

Later that month, the Conservancy told BOG that "the City [had] completed repair of the void under [the] slab" using a specialized grout back-fill mixture. When BOG requested the City's engineering reports, the Conservancy provided a memorandum prepared by the City that described the repair work, but contained no engineering analysis and did not identify the cause of the sinkhole. On October 22, 2018, the Conservancy's attorneys sent BOG a letter demanding that BOG resume construction. After consulting with its engineers and contractors, BOG responded that it would only resume work if the cause of the sinkhole was determined, the sinkhole was repaired under the supervision of a geotechnical engineer, and the geotechnical engineer certified that the affected area and the Community Center were safe. The Conservancy never provided BOG with an engineering report identifying the cause of the sinkhole or certifying the area as safe, and work did not recommence. Citing BOG's failure to complete construction and open the restaurants within the required time period, the Conservancy terminated the lease on May 31 2019.

BOG initiated this litigation in March 2020, alleging that the Conservancy had not adequately addressed issues caused by the sinkhole and raising claims for breach of contract, unjust enrichment, quantum meruit, and litigation expenses The Conservancy answered and counterclaimed for breach of contract against BOG and Drolett. The parties filed cross-motions for summary judgment, which the trial court denied after finding that material issues of fact remained for trial.

As the trial date approached, the Conservancy moved in limine to exclude evidence of lost profits that BOG allegedly suffered when Soulshine and Walker's 1834 did not open. After reviewing that motion, the trial court revisited the Conservancy's summary judgment request, concluding that, with respect to damages for lost profits, the Conservancy was entitled to partial summary judgment based on the "new business rule." As explained by the trial court: "Because these restaurants were new businesses that never opened their doors, the [c]ourt is compelled to find as a matter of law that no evidence exists to satisfy a 'proven track record of profitability' and to provide a basis for the computation of damages as a matter of law." It thus granted the Conservancy partial summary judgment as to any claim for

lost profits damages and, as requested in the motion in limine, excluded evidence regarding such damages. This appeal followed.

The new business rule "provides that, as a matter of law, a new or unestablished business cannot recover lost profits because absent a history of past profits, future profits are too uncertain, contingent, and speculative." *O'Tool v. Genmar Holdings*, 387 F.3d 1188, 1204 (III) (10th Cir. 2004) (citation and punctuation omitted). The trial court found this rule applicable here, citing its belief that "current law bars consideration of lost profits for an unopened business[.]" As the trial court recognized, "[t]he trend in most states . . . has been away from strict application of the new business rule." Id. Nevertheless, because it located no Georgia precedent rejecting strict application of the new business rule, the trial court concluded that any recovery for lost profits was necessarily barred.

Georgia has never explicitly adopted the new business rule, and it is mentioned by name only one time in a prior appellate decision — when our Supreme Court declined to address whether the rule prohibited the recovery of lost profits in a particular case. See *General Electric Co. v. Lowe's Home Centers*, 279 Ga. 77, 80 (2) (608 SE2d 636) (2005). We have explained, however, that "[a]lthough recovery for

lost profits is not necessarily precluded in a tort action, such loss must be capable of reasonably accurate computation." *Molly Pitcher Canning Co. v. Central of Ga. R. Co.*, 149 Ga. App. 5, 11 (4) (253 SE2d 392) (1979) (citation omitted). Thus, "unless the anticipated profits are capable of ascertainment, and the loss of them traceable directly to the defendant's wrongful act, they are too speculative to afford a basis for the computation of damages." Id. at 10-11 (4).

Applying these principles, we have determined in various circumstances that new businesses were unable to present sufficient evidence to support an award of lost profits. See, e.g., *Johnson County School Dist.*, 278 Ga. App. at 113 ("The record before us is void of any competent evidence from which a jury could calculate . . . lost profits [of a newly established lawn care business] with reasonable certainty."); *Market Place Shopping Center v. Basic Business Alternatives*, 227 Ga. App. 419, 422-423 (2) (489 SE2d 162) (1997) (no grounds for ascertaining lost profit damages with reasonable certainty where expert testified that "his calculations were based on expectations and assumptions and that he was required to make these assumptions because the new business did not provide him with a sufficient 'database'"); *Molly Pitcher Canning Co.*, 149 Ga. App. at 11-12 (4) (no basis for reasonably calculating lost

profits for new canning business). And we have noted that "*generally speaking*, lost profits may be recovered by a business only if the business has a proven track record of profitability." *EZ Green Assoc. v. Georgia-Pacific Corp.*, 331 Ga. App. 183, 188 (2) (770 SE2d 277) (2015) (citation and punctuation omitted; emphasis supplied).

This does not mean, however, that Georgia law bars a new business from recovering lost profits as a matter of law in all cases. To the contrary, "the new business rule is simply an extension of the general rule that lost profits are only recoverable if proved to a reasonable degree of certainty." *Jacked Up, LLC v. Sara Lee Corp.*, 854 F.3d 797, 817 (III) (C) (5th Cir. 2017) (citation and punctuation omitted); see also *Johnson County School Dist.*, 278 Ga. App. at 112 ("To recover lost profits, a party must show with great specificity the probable gain as well as the expenses incurred in realizing such gain."). Without a history of profitability, a new business faces difficulty presenting the proof necessary to support a lost profits claim. See *Radlo of Ga. v. Little*, 129 Ga. App. 530, 534 (2) (199 SE2d 835) (1973) ("The general rule is that evidence of expected profits from a new business is too speculative, uncertain, and remote to be considered, and does not meet the legal standard of reasonable certainty.") (citation and punctuation omitted). But we cannot foreclose

the possibility that, under some circumstances, a new business might be able to offer reliable proof of prospective profits. See, e.g., *O'Tool*, 387 F.3d at 1204 (III) ("Instead of a strict bar on such claims, many courts now hold that, regardless of whether a business is new or is established, lost profits can be recovered if it is possible to show by competent evidence and with reasonable certainty that profits would have been made and the amount of those profits."); *Eljer Mfg. v. Kowin Development Corp.*, 14 F.3d 1250, 1256 (IV) (B) (2) (7th Cir. 1994) ("The premise of the so-called 'new business' rule is that the success of a new enterprise is ordinarily uncertain. Where, however, the enterprise is simply an absorption or extension of a previously established successful operation and the venture's future is less in doubt, the awarding of future lost profits is not, as a matter of law, forbidden.").

The key inquiry is whether lost profits are capable of reasonably accurate computation. See *Johnson County Sch. Dist.*, 278 Ga. App. at 112. BOG argued below that Walker's 1834 and Soulshine were to be extensions of The Nook, a pre-existing business with a lengthy history of profitability that provides a reasonable basis for calculating lost profits. It also submitted an expert affidavit from a certified public accountant, who averred that in her professional opinion, lost profits for Walker's

11

1834 and Soulshine could be calculated with a reasonable degree of certainty. The trial court, however, did not consider the particular facts here or assess whether competent evidence offered a sufficient basis for determining lost profits. Instead, it applied an absolute rule of exclusion, concluding that BOG could not recover such profits solely because the restaurants were "new businesses" that never opened.

We cannot agree with this mechanical, bright-line approach. Our case law requires consideration of whether evidence exists to permit a calculation of lost profits. See, e.g., *Johnson County School Dist.*, 278 Ga. App. at 113 (referencing a "void of any competent evidence"); *Market Place Shopping Center*, 227 Ga. App. at 422 (2) (the "evidence did not provide a basis for ascertaining lost profit damages with reasonable certainty"); *Interstate Dev. Svcs. of Lake Park, Ga. v. Patel*, 218 Ga. App. 898, 899 (463 SE2d 516) (1995) ("Where, as here, the evidence shows the claimant was a new business with no history of profits and, in fact, was operating at a loss, the loss of prospective profits is too remote and speculative to support a recovery of damages.") (citation and punctuation omitted). A decision that automatically bars a new business from recovering lost profit erodes this fact-based inquiry. Accordingly,

12

we vacate the trial court's summary judgment ruling and remand for further proceedings consistent with this opinion.[2]

*Judgment vacated and case remanded with direction. McFadden, P. J., and Rickman, J., concur.*

---

[2] We express no opinion as to whether competent evidence offers a sufficient basis for determining lost profits in this case. Rather, we remand for the trial court to consider the issue.