# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-30824

United States Court of Appeals
Fifth Circuit

**FILED**

December 16, 2019

Lyle W. Cayce
Clerk

MICHAEL TODD RYDER, both individually and as natural Father
on behalf of MICHAEL TODD RYDER, II;
LORI POWELL, both individually and as natural Mother
on behalf of MICHAEL TODD RYDER, II;
NELL THERESA RYDER, both individually and as natural Mother
on behalf of JOHN CAMERON WATSON;
HERBERT PAUL BARRAS, JR., both individually and as natural Father
on behalf of HERBERT PAUL BARRAS, III;
LISA BARRAS, both individually and as natural Mother
on behalf of HERBERT PAUL BARRAS, III,

Plaintiffs–Appellants,

PIPELINE CONSTRUCTION & MAINTENANCE, INCORPORATED;
ZURICH AMERICAN INSURANCE COMPANY,

Intervenors–Appellants.

versus

UNION PACIFIC RAILROAD COMPANY;
UNION PACIFIC RAILROAD CORPORATION;
KINDER MORGAN G.P., INCORPORATED;
KINDER MORGAN ENERGY PARTNERS, L.P.,

Defendants–Appellees.

Appeal from the United States District Court
for the Middle District of Louisiana

No. 18-30824

Before OWEN, Chief Judge, JONES and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

It is alleged that Union Pacific Railroad Company and Union Pacific Corporation ("Union Pacific") negligently contributed to a fatal railroad collision. The plaintiffs and intervenors ("plaintiffs") appeal a summary judgment for Union Pacific. We affirm.

## I.

On a dreary winter's afternoon in rural Louisiana, three coworkers drove through rain and fog as the last in a caravan of four commercial trucks that approached their job site, a local oil and gas pipeline facility, via a private gravel road. Just before reaching a cattleguard gate, the caravan had to cross railroad tracks. One-by-one, each of the first three trucks paused at the stop sign for the railroad crossing, slowly crossed the tracks, then stopped at the gate to wait for someone from the lead truck to unlock it. The last truck followed suit, but, as the first three parked trucks had left insufficient room for the last truck to clear the crossing, the driver stopped his truck on the tracks. Seconds later, a southbound Union Pacific train approached at a speed of fifty-one miles per hour. Hearing the train's horn too late, if at all, the three occupants were killed in the subsequent collision.

The relevant railroad crossing[1] ("the Oil & Gas Crossing" or "the Crossing") provides the sole route for vehicles to access a local pipeline and wells, which are operated by three different businesses.[2] After exiting Louisiana Highway 5, motorists drive seventy feet east to the Oil & Gas Crossing, whence

---

[1] Officially, United States DOT Grade Crossing No. 755983T.

[2] The three deceased were contractors employed by Pipeline Maintenance & Construction, which is an intervening plaintiff.

No. 18-30824

it is a further eighty-five feet to the gate. The private drive intersects with the railroad tracks at close to a right angle, but a gentle curve and elevation change, coupled with trees and vegetation, slightly obscures an oncoming southbound train from motorists' view until it should come within 350 feet of the Crossing. Trains regularly traverse the Crossing at speeds approaching sixty miles per hour.

Union Pacific owns the Oil & Gas Crossing. Sometime after another truck collision in 2008 (and a near-miss in 2009), Union Pacific management inspected the Crossing and deemed it to be "private [ ] with public character-istics." The railroad then installed a stop sign and crossbuck[3] at the Crossing, though it stopped short of taking further precautionary measures—such as lights, gates, or contract flaggers—that it employed for other crossings in the immediate area.

The bereaved families initiated this federal diversity action against Union Pacific,[4] alleging that the railroad had negligently contributed to the collision. Decedents' employer and insurance company intervened as plaintiffs to recover disbursed benefits. Union Pacific filed two motions for summary judgment that, together, covered all claims against it. The district court granted both, and the plaintiffs appeal.

---

[3] A "crossbuck" is an X-shaped sign indicating a rail crossing. The plaintiffs claim that the sign that Union Pacific installed at the Oil & Gas Crossing was not technically a crossbuck, and Union Pacific's motion for summary judgment indeed referred to the sign not as a crossbuck but as a "crossing placard." The court thus may have been inaccurate in stat-ing that it was "undisputed that [the Oil & Gas Crossing] was marked with a railroad cross buck . . . ." *Ryder v. Union Pac. R.R. Co.*, 2017 WL 4364412, at \*3 (M.D. La. 2017). Regard-less, any distinction between a crossbuck and a crossing placard is immaterial to our analysis, so we follow the district court in referring to the sign as a "crossbuck."

[4] They also sued the companies alleged to control the gate to the pipeline facility. The appeal before us, however, concerns only Union Pacific.

No. 18-30824

II.

This court "review[s] summary judgment de novo, applying the same legal standards as the district court." *Prospect Capital Corp. v. Mut. of Omaha Bank*, 819 F.3d 754, 756–57 (5th Cir. 2016). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

In reviewing whether there be a genuine dispute of material fact, the court is to "consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008). Instead, we must read all evidence in the light most favorable to the nonmoving party and likewise draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If there be any genuine dispute of material fact that a trier of fact may reasonably resolve in favor of either party, then summary judgment must be denied. *Id.* At the same time, "[s]ummary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015).

"When, as in this case, subject matter jurisdiction is based on diversity, federal courts apply the substantive law of the forum state . . . ." *Id.* For guidance, we turn first to Louisiana's highest court and otherwise look to its intermediate courts to determine how the highest court should likely rule. *Meador v. Apple, Inc.*, 911 F.3d 260, 264 (5th Cir. 2018). If guidance be lacking still, this court is not to innovate new "theories of recovery." *Id.* The plaintiffs' allegations against Union Pacific broadly encompass (1) breach of a duty to install sufficient visual warning devices at the Crossing and (2) negligent

No. 18-30824

operation of the locomotive horn.  We consider each in turn.

### III.

"In order to determine whether liability exists under the facts of a particular case, [the Louisiana Supreme] Court has adopted a duty-risk analysis." *Duncan v. Kansas City S. Ry. Co.*, 773 So. 2d 670, 675 (La. 2000).  To recover, a "plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant and the risk of harm was within the scope of protection afforded by the duty breached." *Id.*

The plaintiffs claim that Union Pacific breached a duty to provide adequate visual warning devices at the Oil & Gas Crossing.  "[W]e begin our [ ] analysis by examining the duty owed," if any, "by [Union Pacific] to the plaintiffs." *Id.* at 676.

### A.

Although Louisiana statutory law requires owners of public rail crossings to install various visual safety devices, *see, e.g.*, LA. REV. STAT. ANN. § 32:169, it is less clear what duties apply to owners of *private* crossings.  Certain language suggests that—with narrow exception—all duties of rail crossing owners arise by statute, which would leave owners of private crossings generally free from any duty.[5]  But other language suggests that the Louisiana Civil Code "place[s] duties upon" the owner of a rail crossing—private or public—to "maintain[] the safety of the intersection" with reasonable care, the breach of

---

[5] *See Davis v. Canadian Nat'l Ry.*, 137 So. 3d 11, 13 (La. 2014) (per curiam) (stating that, beyond statutory duties, "any further duty to warn" would apply only if the crossing were a "dangerous trap"); *see also Rivere v. Union Pac. R.R. Co.*, 647 So. 2d 1140, 1145 (La. App. 1st Cir. 1994), *writ denied*, 651 So. 2d 295 (La. 1995).

which "may serve as the basis for a tort claim[.]"[6]

Such passages might be reconciled by holding that the Louisiana Civil Code attaches a general duty for owners and operators to maintain safety at crossings, which, for public crossings, is presumptively satisfied by statutory compliance. At public crossings, there must be a crossbuck installed, and the Louisiana Department of Transportation and Development may order the installation of additional warning devices "[w]henever [it] determines that a particular traffic control device needs to be installed[.]" LA. STAT. ANN. § 32:169(A), (E)(1). A railroad's reliance on and deference to the Agency's regulatory mandate would be reasonable, and any extra warning device would be an "unusual precaution[]" required only in exceptional circumstances. *Rivere*, 647 So. 2d at 1145.

Were the Oil & Gas Crossing a public crossing, Louisiana's regulatory authorities might or might not have required Union Pacific to install warning devices beyond the crossbuck, such as lights or gates. *See* LA. STAT. ANN. § 32:169(E)(1). Instead, it fell solely on Union Pacific to determine what devices, if any, were reasonably required to "maintain[] the safety of the intersection." *Holloway*, 988 So. 2d at 858. And Union Pacific acted accordingly— it was its agents, not Louisiana's, who inspected the Crossing and made recommendations to install various signs in the wake of the 2008 truck collision and the 2009 near-miss. Perhaps those signs satisfied Union Pacific's possible duty under Article 2317.1 of the Louisiana Civil Code, but the existence of such a duty is a different question altogether.

Nevertheless, "it is not for us to adopt innovative theories of recovery

---

[6] *Holloway v. Kansas City S. Ry. Co.*, 988 So. 2d 854, 858 (La. App. 2d Cir. 2008) (citing LA. CIV. CODE ANN. Art. 2317.1)).

under state law," "[e]ven in the rare case where a course of [Louisiana] decisions permits us to extrapolate or predict with assurance where that law would be had it been declared[.]" *Meador*, 911 F.3d at 264. The only Louisiana case to speak directly to the respective duties surrounding private versus public rail crossings is approaching its centennial. *See Townsend v. Mo. Pac. R.R. Co.*, 3 La. App. 598, 603–04 (1925). Being a federal court, "out of the mainstream of [Louisiana] jurisprudential development," we decline to issue a holding so broad as to affect tort duties relating to all private rail crossings. *Meador*, 911 F.3d at 264.

## B.

It is not a novel supposition, however, that Louisiana law imposes on owners and operators an extra-statutory duty to maintain safety at *some* rail crossings. Most settled is the "dangerous trap" doctrine, which applies to crossings where "the view of the roadway is so obstructed as to require the user to place himself in a position of peril dangerously near the tracks to have a view of any oncoming traffic." *Davis*, 137 So. 3d at 13. "When a dangerous trap exists, the railroad company will be held liable" even if it met its statutory obligations, "unless it can show that it took unusual precautions, such as reducing the speed of the train, or increasing its warning or providing signaling devices, etc." *Rivere*, 647 So. 2d at 1145.

Although the plaintiffs cite a variety of "dangerous conditions" at the Oil & Gas Crossing, they do not contend that motorists must venture dangerously close to the tracks to obtain a line-of-sight with an oncoming train. Therefore, as a matter of Louisiana law, the Crossing is not a "dangerous trap." *See Davis*, 137 So. 3d at 13.

Even so, Union Pacific might be held liable should the Oil & Gas Crossing constitute a "unique hazard." Beyond the "dangerous trap" doctrine,

a railroad may be found liable—notwithstanding "compliance with statutory provisions"—for providing inadequate safety devices at distinctly dangerous crossings. *Duncan*, 773 So. 2d at 676; *but cf. Davis*, 137 So. 3d at 13. In *Duncan*, 773 So. 2d at 677, the Louisiana Supreme Court held that a high-volume, high-speed intersection created "visual clutter" amounting to a "unique hazard," against which "the jury could have reasonably concluded that [the railroad] had a duty to plaintiffs to protect[.]" The plaintiffs do not allege that the Oil & Gas Crossing is beset by such visual clutter, but we must consider whether other "unique" conditions might qualify it as critically hazardous. *See id.*

The aforementioned "dangerous conditions" of the Oil & Gas Crossing, though not relevant to the "dangerous trap" doctrine, would inform our "unique hazard" inquiry. The plaintiffs claim that an elevation change and curve in the track, combined with surrounding vegetation, reduces the distance at which motorists can view oncoming southbound trains. They further contend that noise from oil field equipment and vehicles impedes motorists' ability to hear a train horn. Under such conditions, the plaintiffs estimate that "a motorist would have less than four seconds to see and hear [a southbound] train" traveling at the sixty-mile-per-hour limit. Further, the proximity of the Crossing between the public highway and the locked gate leaves limited space for large commercial vehicles.[7] Union Pacific knew that such vehicles regularly traversed the Crossing and that one of them had already collided with a train. Under the totality of the circumstances, we believe a "jury could [ ] reasonably conclude[] that [Union Pacific] had a duty to plaintiffs to protect against the unique hazard presented by the [Oil & Gas] crossing." *Id.*

---

[7] The Oil & Gas Crossing is seventy feet east of Louisiana Highway 5 and eight-five feet west of the access gate to the oil facility.

No. 18-30824

The mere existence of a duty would not be enough to establish liability; the plaintiffs must also prove, among other things, that Union Pacific breached that duty. *See id.* at 675–76. Plaintiffs assert that if Union Pacific had provided "active warnings"—such as lights, gates, or flaggers—the accident "likely would not have occurred." But the railroad would be required to take all possible precautions to prevent any collision.[8] We would not need to inquire whether Union Pacific's signage were sufficient to prevent the collision; obviously, and tragically, it was not.[9] Instead, we would ask whether such signage were "sufficient warning . . . commensurate with the danger of the crossing." *Id.* at 676.

The plaintiffs have not presented evidence indicating otherwise. Although not necessarily required to do so, Union Pacific cleared surrounding vegetation in compliance with Louisiana statutory law for *public* crossings. *See* LA. STAT. ANN. § 48:386.1(A), (C). The private gravel road leading to the Crossing was not subject to high-speed or confusing traffic of a kind that might cause drivers to miss the sign. *Cf. Duncan*, 773 So. 2d at 677. The railroad installed a crossbuck and stop sign. The plaintiffs do not claim that, having paused at the stop sign (as the decedents did), a driver could not determine whether the vehicle ahead of him left enough space to clear the tracks. Neither do plaintiffs claim that said driver could not perceive an oncoming train in time either to refrain from crossing or, given a clear roadway ahead, move forward to safety.

Neither have the plaintiffs presented facts suggesting that Union Pacific

---

[8] *See Rivere*, 647 So. 2d at 1145 ("[D]uties of the railroad with regard to further safety devices rise[] in proportion to the increasing dangerousness of the crossing[.]").

[9] *See Kendrick v. Louisiana & Nw. R.R. Co.*, 766 So. 2d 705, 714 (La. App. 2d Cir. 2000) ("[T]he mere happening of an accident does not engender a presumption that defects are present.").

violated a voluntarily assumed duty. "Unique hazard" doctrine notwithstand-ing, once Union Pacific had "voluntarily assumed" a duty to warn motorists, Louisiana law requires it perform that duty "with due care." *Saldana v. Larue Trucking, LLC*, 268 So. 3d 430, 437 (La. App. 2d Cir. 2019), *writ denied*, 2019 La. LEXIS 2389 (La. Oct. 1, 2019). Plaintiffs do not dispute that Union Pacific installed warning signs or even that the decedents saw those signs.[10] Instead, they assert that Union Pacific's signage was in fact counterproductive, as "most [recent] incidents at private crossings occur at crossings with stop signs." But correlation does not imply causation—stop signs are the most common passive warning device.[11] Neither are we convinced by the plaintiffs' proffered studies questioning the general efficacy of stop signs based on poor compliance rates or deleterious traffic effects: The decedents did stop at the sign, and the traffic buildup on the other side of the Crossing resulted from the gate, not the sign.

"A motorist negotiating a railroad crossing is burdened with the respon-sibility of seeing and hearing that which he could have seen and heard, and he is presumed in law to have seen and heard what he could have seen and heard." *Glisson v. Mo. Pac. R.R. Co.*, 165 So. 2d 289, 291 (La. 1964). Although the plaintiffs cite dangerous conditions to support application of a potential duty to warn motorists approaching the Oil & Gas Crossing, they have not shown why the signs Union Pacific installed were insufficient to fulfill any such duty.[12]

---

[10] *Cf. Saldana*, 268 So. 3d at 438–39 (outlining factual dispute of whether warning signs were in place on the day of the accident).

[11] *See* U.S. Dep't of Transp., Fed. Railroad Admin., Private Highway-Rail Grade Crossing Safety Research and Inquiry 20–21 (2010).

[12] The same reasoning would apply even if, as the plaintiffs contend, Union Pacific voluntarily assumed a duty to warn motorists.

No. 18-30824

IV.

The plaintiffs also claim that Union Pacific was negligent in operating the locomotive horn. Specifically, they claim that Union Pacific equipped its train with an inadequately loud horn; that the engineer sounded a horn pattern in violation of Union Pacific's internal procedures; and that Union Pacific failed to train its employees to operate the horn adequately in emergencies. In response, Union Pacific contends that each claim is either preempted by federal law or otherwise unsupported by evidence sufficient to survive summary judgment. We agree with Union Pacific.

A.

The Federal Railroad Safety Act ("FRSA"), 49 U.S.C. §§ 20101 *et seq.*, preempts certain state tort claims alleging negligence in railroad operation. *See Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 640 (5th Cir. 2005). Should a provision of the FRSA "substantially subsume the subject matter" of a claim, *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993), the claim would be colorable only to the extent it alleges either a "fail[ure] to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation . . . covering the subject matter," or a "fail[ure] to comply with [the railroad's] own plan, rule, or standard that it created pursuant to a regulation or order," 49 U.S.C. § 20106(b)(1)(A), (B).

Federal law "substantially subsumes" the subject of train-horn operation in emergencies. The relevant regulation states that "a locomotive engineer may sound the locomotive horn to provide a warning to animals, vehicle operators, pedestrians, trespassers or crews on other trains in an emergency situation if, in the locomotive engineer's sole judgment, such action is appropriate in order to prevent imminent injury, death, or property damage." 49 C.F.R. § 222.23(a)(1). The plaintiffs assert that, given that Union Pacific issued its

11

horn-sequence procedure "pursuant to a regulation or order," the claim that the railroad negligently violated its own rule is not preempted.[13]  We disagree.

First, the plaintiffs suggest that Union Pacific's internal horn-sequence rules[14] were created per 49 C.F.R. § 217.7–11, which mandates that a railroad instruct its employees on its own internal operating procedures and file a copy of those procedures with the Federal Railroad Administration.  But according to that logic, *all* internal practices would be made "pursuant to a regulation" and thereby create a source of tort liability.  Although the administrative agencies could theoretically issue such a rule, we presume that they, no less than Congress, do not "hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).  Instead of interpreting Section 217 to "alter the fundamental details of [the] regulatory scheme," *id.*, we read it as fulfilling its narrow, stated purpose: to inform the agencies of "the condition of operating rules and practices with respect to trains[.]"  49 C.F.R. § 217.1.

Nor do we accept the plaintiffs' assertion that Union Pacific issued its internal policy on horn patterns "pursuant to" Section 222.23.  Although that regulation subsumes the subject matter of horn blasting in emergency situations, it does not impose a duty or even suggest that a railroad instruct its engineer on a precise horn sequence.  Its plain language in fact suggests the

---

[13] Alternatively, the plaintiffs imply that a preemption analysis is unnecessary.  For that proposition, they rely on a case in which, before finding that a similar "horn claim fail[ed] for lack of causation," the district court briefly stated that a state-law claim alleging a railroad's failure "to comply with its own plan, rule, or standard that it created is not preempted." *Holstine v. Nat'l R.R. Passenger Corp.*, 2015 WL 3766804 at *9 n.4 (S.D. Miss. June 16, 2015) (quotation marks omitted).  But that court does not appear to have considered the rest of the statutory clause, which specifically contemplates a "plan, rule, or standard that [the railroad] created *pursuant to a regulation or order issued by either of the Secretaries*[.]"  49 U.S.C. § 20106(b)(1)(B) (emphasis added).

[14] Union Pacific has adopted the General Code of Operating Rules (G.C.O.R.), within which Rule 5.8.2 discusses applicable horn-blast sequences.

opposite:  Engineers should maintain "sole" discretion in use of the horn.  That such horn use might take the form of a particular sequence is immaterial.[15]

The plaintiffs cite *Carter v. National R.R. Passenger Corp.*, 63 F. Supp. 3d 1118 (N.D. Cal. 2014), to suggest that their claims are not preempted.  That case, however, involved a *public* crossing subject to Section 222.21.  *See Carter*, 63 F. Supp. 3d at 1157.  Having discussed at length the distinction between private and public crossings in the realm of visual safety devices and Louisiana law, we are hardly willing to abandon the distinction when reading federal regulation.  And even then, Union Pacific's internal rule could not have been made "pursuant to" Section 222.21, because that section prescribes a horn sequence different from that described in Union Pacific's rule.[16]  Because the plaintiffs have failed to identify an applicable regulation or order under which Union Pacific issued its internal rule regarding horn sequences, their "claim is preempted by federal law."  *Hesling*, 396 F.3d at 638.

Similarly preempted is the plaintiffs' claim that Union Pacific violated a duty to train its employees on the limitations and effectiveness of locomotive horns in emergency situations.  The plaintiffs style their claim as alleging that Union Pacific failed to apprise its employees of its own rules, and it is correct that Section 217.11 requires a railroad to instruct its employees as to the company's internal operating rules.  But the plaintiffs fail to cite an applicable

---

[15] *Cf. Baker v. BNSF Ry. Co.*, 2010 WL 4063203 at \*8 (N.D. Tex. Oct. 13, 2010) (noting that federal speed regulations imply that engineers "maintain a safe course and remain alert and attentive").

[16] Title 49 C.F.R. § 222.21(a) provides that, as a general matter, engineers are to sound "two long blasts, one short blast and one long blast" when approaching a public crossing.  The plaintiffs claim that Union Pacific violated its internal rule, G.C.O.R. 5.8.2, by not blasting a series of "short successive sounds."

No. 18-30824

internal rule.[17] It thus appears that the true issue they raise is that an engineer's training does not require that he be informed of horn effectiveness—a claim that is preempted by federal regulation.[18]

B.

As to horn volume, it is undisputed that 49 C.F.R. § 229.129(a) creates a federal standard of care by setting "a minimum sound level of 96 dB(A) . . . at 100 feet forward of the locomotive in its direction of travel." The plaintiffs are not preempted from claiming that Union Pacific failed to comply with that standard of care. *See* 49 U.S.C. § 20106(b)(1)(A). We therefore consider whether they have presented a genuine dispute as to any material fact precluding summary judgment for Union Pacific on that claim.

In support of their claim that the locomotive horn was insufficiently loud, the plaintiffs provide two forms of evidence. First, they assert that witnesses to the collision either did not hear the horn or heard it only briefly. Second, they attack the validity of Union Pacific's horn tests showing adherence to federal audibility standards by noting that the railroad did not record background noise during those tests.

Testimony from aural witnesses may create a genuine dispute of material fact as to the loudness of the horn. In one case, witnesses used a ten-point numeric scale to testify that the train horns sounded louder during actual operation than during the horn tests. *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d

---

[17] The plaintiffs contend that G.C.O.R. 1.1's admonition for employees to "take the safe course," "be careful to prevent injuring themselves or others," and "be alert and attentive when performing their duties and plan their work to avoid injury" requires they be trained on highly specific horn safety studies. Under such a reading, the railroad would be obligated to instruct its employees on almost every possible factor for any given situation.

[18] *See generally* 49 C.F.R. §§ 240 *et seq.* ("Qualification and Certification of Locomotive Engineers").

496, 513 (5th Cir. 1999), *superseded by statute on other grounds, as noted in Mathis v. Exxon Corp.*, 302 F.3d 448, 459 n.16 (5th Cir. 2002). Those witnesses also heard the horns on many occasions, including during both testing and normal operation, rather than just one time. *Id.* at 512–14. Such testimony, notwithstanding the railroad's testing documentation, was enough to preclude summary judgment. *Id.* at 513–15.

The testimonial evidence in this case, however, is not. Unlike in *Rushing*, the plaintiffs' witnesses did not hear the horn during both testing and regular operation, and their statements speak not to the loudness of the horn but of its timing and presence—that is, when they heard the horn, if at all.[19] And plaintiffs have provided no evidence comparing what their witnesses heard (or did not hear) with what they would have heard had the horn met federal audibility standards.

In the absence of evidence suggesting the horn failed to meet federal audibility standards, it is not enough for the plaintiffs to call into question the validity of Union Pacific's tests. "[T]here must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252(1986). If we accept that the horn tests were worthless for failing to record background noise levels, the plaintiffs would only have negated evidence demonstrating the horn's compliance with federal standards; they would not have presented evidence suggesting non-compliance. Even presented in a light most favorable to the plaintiffs, the evidence would provide a

---

[19] The plaintiffs do not claim that the horn either did not sound or sounded too late; instead, they posit that it sounded too quietly. Statements that the horn sounded only moments before the collision, or that it did not sound at all, are largely irrelevant to such a claim. *Cf. Rasmusen v. White*, 970 F. Supp. 2d 807, 827 (N.D. Ill. 2013) ("[T]here is a genuine dispute as to whether the train horn was sounded, or sounded at the appropriate statutory interval[.]").

factfinder with no basis for deciding that the horn did not meet federal audibility standards.

"While this matter involved a tragic accident, based on the evidence presented, we find there existed no genuine [dispute] of material fact that if proven at the trial would or could, under [Louisiana's] duty-risk analysis, demonstrate [Union Pacific's] liability for the fatal accident." *Davis*, 137 So. 3d at 13. The summary judgment is AFFIRMED.