# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 14, 2021

Lyle W. Cayce
Clerk

No. 19-30705

Troy Lillie; Leah Farr; Kenneth Doughtery;
Charles White; Martha Jean Witmer; Et Al.,

*Plaintiffs—Appellants*,

*versus*

Office of Financial Institutions State of Louisiana;
SEI Investments Company; SEI Private Trust Company;
Continental Casualty Company;
Certain Underwriters at Lloyd's of London;
Indian Harbor Insurance Company;
Nutmeg Insurance Company; Arch Insurance Company;
Allied World Assurance Company (U.S.), Incorporated,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:13-CV-150
No. 3:19-CV-138

Before Smith, Graves, and Ho, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

This is one of many lawsuits resulting from the collapse of Robert Stanford's Ponzi scheme. The plaintiffs are among the unfortunate investors

who purchased or renewed certificates of deposit ("CDs") issued by Stanford International Bank, Ltd. ("SIBL"). After their investments went up in smoke, the plaintiffs sued, among others, SEI Investments Company and SEI Private Trust Company (jointly, "SEI"), businesses that had a longstanding relationship with SIBL. As relevant, the district court denied the plaintiffs a continuance for further discovery, then awarded summary judgment to SEI, concluding that it had not controlled the primary securities violations of Stanford Trust Company ("STC").[1] We affirm.

## I.

STC served as the custodian for all IRA accounts holding CDs from SIBL. Starting in 1998, SEI provided STC with investment-processing and reporting services using its proprietary Trust 3000 software. That software allows trust companies to view all their assets—including non-marketable assets such as CDs—in one platform.

SEI offered its processing services through, among other means, a business services provider ("BSP") model, and STC was one of SEI's clients that used that model. In short, that meant that SEI assumed STC's "back-office processing function." SEI's contract with STC outlined what that function would entail.

The contract contemplated that SEI would be an independent contractor; it limited SEI's involvement with the CDs. STC (but not SEI) priced the CDs and other non-marketable securities,[2] and SEI did not perform due diligence on how STC valued the CDs. Instead, STC provided SEI with all the relevant information, including the CDs' face value, interest rate, matur-

---

[1] The court also granted summary judgment to SEI's insurers: Allied World Assurance Company (U.S.), Incorporated; Arch Insurance Company; Continental Casualty Company; Indian Harbor Insurance Company; Nutmeg Insurance Company; and Certain Underwriters at Lloyd's of London (collectively, the "Insurer Defendants").

[2] By contrast, SEI was responsible for establishing the value of publicly traded securities using pricing services from Interactive Data Services, Inc.

ity date, and market value, and STC was "solely responsible" for that data's "accuracy and completeness." SEI could "rely upon [i]nstructions" from STC, and STC had a right to inspect SEI's records, but not vice versa.

SEI also furnished STC with statement production and printing services, including the creation of client statements and tax forms. To do so, SEI sent data from Trust 3000 to a third-party printer. STC was still responsible for reviewing and distributing the statements, and the statements made plain that they were STC's (not SEI's).[3] STC had the printer mail the statements directly to clients.

STC paid SEI a fixed fee, including $110 for each account that had only CDs from SIBL. During the relevant period, SEI billed STC about $808,000 for all services, $279,000 of which was for CD-only accounts.

After the Ponzi scheme had crashed and burned, the plaintiffs sued SEI and several others in state court, alleging violations of Louisiana securities law. Specifically, the plaintiffs brought primary liability claims under LOUISIANA REVISED STATUTES §§ 51:712(D) and 51:714(A) and a secondary control-person liability claim under § 51:714(B). The district court certified a class including all persons who bought or renewed CDs from SIBL in Louisiana between January 1, 2007, and February 13, 2009.

After certification, the plaintiffs amended their complaint to assert direct-action claims against the Insurer Defendants, who promptly removed the case under the Class Action Fairness Act. *See* 28 U.S.C. §§ 1332(d)(2), 1453(b). The Judicial Panel on Multidistrict Litigation ("JPML") then severed the claims against the Louisiana Office of Financial Institutions and transferred the rest of the case to the relevant multidistrict litigation ("MDL") in the Northern District of Texas.

---

[3] The statements went so far as to explain that "SIBL is the provider of your certificate of deposit investment(s) and, therefore, its statement is to be relied upon for the actual value and activity of your investment."

At the plaintiffs' request, the court ordered the parties to hold a Federal Rule of Civil Procedure 26(f) conference. The parties did so and filed their report in June 2015. The court eventually dismissed or granted partial judgment for the defendants on the §§ 714(A) and 714(D) claims. At that point, only the control-person claim remained. The district court recertified the class.

The case pended in the Northern District of Texas for more than five years, during which time the discovery process largely stalled. The parties dispute the cause of the breakdown and the adequacy of discovery, but the plaintiffs did not seek judicial assistance until May 2018—some three years after filing the Rule 26(f) report—when they asked for a status conference. At that conference, the court suggested that the plaintiffs either take a deposition under Federal Rule of Civil Procedure 30(b)(6) or move to compel answers to their interrogatories. The court did not enter a scheduling order, and it invited SEI to move for summary judgment at any time, subject to the plaintiffs' right to seek a continuance under Federal Rule of Civil Procedure 56(d).

SEI so moved in September 2018. Among other things, the plaintiffs responded by asking for a Rule 56(d) continuance. They supported that request with a declaration from one of their lawyers, who asserted that the plaintiffs lacked the discovery they needed to oppose summary judgment.

Before ruling, the JPML remanded the case to the Middle District of Louisiana. That court granted SEI summary judgment, finding that SEI had not controlled STC's primary securities violations. Conversely, the court denied a continuance, ruling that the plaintiffs had not established Rule 56(d)'s requirements or pursued discovery with diligence. Soon thereafter, the court granted summary judgment to the Insurer Defendants on the direct-action claims. The plaintiffs unsuccessfully moved for reconsideration and ask us to reverse.

I.

The plaintiffs challenge the summary judgment, which we address *de novo*, construing all facts and reasonable inferences in favor of the non-moving party. *Ryder v. Union Pac. R.R. Co.*, 945 F.3d 194, 199 (5th Cir. 2019). If proof is absent, we cannot "assume that the nonmoving party could or would prove the necessary facts" to defeat summary judgment. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (emphasis omitted).

A.

Under Louisiana law, a party can be secondarily liable for the primary securities violation of another:

> Every person *who directly or indirectly controls* a person liable under Subsection A of this Section, every general partner, executive officer, or director of such person liable under Subsection A of this Section, every person occupying a similar status or performing similar functions, and every dealer or salesman who participates in any material way in the sale is liable jointly and severally with and to the same extent as the person liable under Subsection A of this Section . . . .

LA. REV. STAT. § 51:714(B) (emphasis added). Secondary liability under Section 714(B) thus requires (1) a primary securities-law violator and (2) a second actor that controlled the primary violator. *Id.*

But what makes for "control"? The statute defines it as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Id.* § 51:702(4). "The language of [§ 714(B)] indicates that a person who exercises control refers to a general partner, executive, officer, director, or a person occupying a similar status or performing a similar function." *Solow v. Heard McElroy & Vestal, L.L.P.*, 7 So. 3d 1269, 1281 (La. App. 2d Cir.), *writ denied*, 17 So. 3d 961 (La. 2009).

"Because Louisiana precedent interpreting Section 51:714(B) is thin,

we look to federal law for instruction." *Ahders v. SEI Priv. Tr. Co.*, 982 F.3d 312, 315 (5th Cir. 2020) (cleaned up).[4]  At a minimum, the plaintiffs must "show that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based." *Heck v. Triche*, 775 F.3d 265, 283 (5th Cir. 2014) (cleaned up).  But there is no requirement that the defendant participate in the fraudulent transaction itself.[5]

## B.

The plaintiffs say that summary judgment was improper, because the district court applied the wrong legal standard and ignored factual disputes as to SEI's asserted control.[6]  Neither theory succeeds.

### 1.

The plaintiffs' wrong-legal-standard quibble has three steps.  First,

---

[4] *See also State v. Powdrill*, 684 So. 2d 350, 353 (La. 1996) ("Our courts . . . look to the federal law and jurisprudence interpreting the securities law for guidance in interpreting the Louisiana provisions.").

[5] *Heck*, 775 F.3d at 283; *see also Trans Pac. Interactive, Inc. v. U.S. Telemetry Corp.*, 2017 WL 1376592, at *5 (La. App. 1st Cir. May 1, 2017) ("Control person liability does not require participation in the fraudulent transaction."), *writ denied*, 227 So. 3d 294 (La. 2017). We have not decided whether, to be liable, the alleged control person must have "*actually* exercised his power over the controlled person." *Heck*, 775 F.3d at 283 n.18 (emphasis added); *see also Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 620 (5th Cir. 1993) (declining to answer that question).

[6] The plaintiffs insist that the references to "SEI" in their briefing include the Insurer Defendants.  But the plaintiffs fail to discuss the direct-action claim against those defendants, nor do they cite the relevant statute or any case.  Their claim against those defendants is therefore abandoned. *See N. Cypress Med. Ctr. Operating Co., Ltd. v. Cigna Healthcare*, 952 F.3d 708, 711 n.3 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1053 (2021).

But, even if we consider it, it fails.  The Louisiana statute, *see* LA. REV. STAT. § 22:1269, "does not create an independent cause of action against the insurer; it merely grants a procedural right of action against an insurer where the plaintiff has a substantive cause of action against the insured," *SEC v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830, 850 (5th Cir. 2019) (cleaned up), *cert. denied*, 140 S. Ct. 2567 (2020).  Because the plaintiffs' claims against SEI are dead in the water, their claim against the Insurer Defendants perishes too.

the district court relied on *Friedman v. JP Morgan Chase & Co.*, No. 15-cv-5899, 2016 WL 2903273 (S.D.N.Y. May 18, 2016), *aff'd*, 689 F. App'x 39 (2d Cir. 2017) (per curiam). Second, *Friedman* mentions the "culpable participation" test "no [fewer] than ten times." Third, it necessarily follows that the court improperly applied a "culpable participation" requirement—one that our caselaw disclaims. *See Heck*, 775 F.3d at 286.

The conclusion does not follow, and the record proves it. The district court correctly identified that the "[p]laintiffs need not prove that SEI participated in the fraudulent transaction." The court relied on *Friedman* only in reasoning that a showing of "but-for causation"—namely that SEI might have been able to prevent STC's violations—is not enough to establish control. Such a rationale (which Louisiana caselaw supports[7]) is distinct from *Friedman*'s independent holding that the plaintiffs there had not alleged culpability.[8] One may cite a case without endorsing everything for which it stands. The district court understood the law.

2.

The plaintiffs also inform us that it is factually disputed whether SEI had the requisite control. Not so.

SEI—the movant—has offered competent evidence that it lacked the power to control STC's primary securities violations.[9] SEI points first to the contractual terms, under which STC (not SEI) was responsible for pricing the CDs, providing SEI with complete and accurate data, reviewing monthly

---

[7] *See Solow*, 7 So. 3d at 1281 (holding that an auditor's "power to halt the sale" of securities to the plaintiffs was not enough to establish control under Section 714(B)).

[8] *See Friedman*, 689 F. App'x at 39–40 (noting that the district court dismissed the plaintiffs' control-person claims on three independent grounds).

[9] *See Carr v. Air Line Pilots Ass'n, Int'l*, 866 F.3d 597, 601 (5th Cir. 2017) (per curiam) ("Once a movant who does not have the burden of proof at trial makes a properly supported motion for summary judgment, the burden shifts to the nonmovant to show that the motion should not be granted." (cleaned up)).

statements, and distributing those statements to investors.  Moreover, STC could instruct SEI to do certain things, but that authority was not reciprocal.

SEI also offers testimony from Al DelPizzo, SEI's then-Vice President of Operations, from the class-certification hearing.  He stated that, consistently with the contract, STC gave SEI all the valuation information that it needed for the CDs.  Moreover, SEI never had custody of the CDs, and it did not price CDs for *any* bank (let alone STC), sell or market them, or audit the data that it prepared for STC's accounts.  SEI also lacked an ownership stake in STC and had no representative on its board:  SEI could not direct STC's management or policies.

Because SEI, the movant, has informed "the court of the basis for its motion" and identified "portions of the record which highlight the absence of genuine factual issues" about whether SEI controlled STC's primary violation, the burden rests with the plaintiffs to "direct the court's attention to evidence . . . sufficient to establish that there is a genuine issue of material fact for trial."  *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).  The plaintiffs come up empty.  They lead off with a sweeping assertion that SEI was the "defacto [*sic*] trust company" for STC, considering the "comprehensive scope of [] services" that SEI provided, "the cradle to grave relationship" between STC and SEI, and "the sophistication of SEI and the lack of sophistication of STC."  In considering the thrust of that evidence, the plaintiffs assert, the court failed to draw inferences in their favor.

At bottom, the plaintiffs seem to think that SEI's longstanding ties to STC create a dispute over whether SEI had control.  But the plaintiffs fail to explain how those ties evidence anything more than that SEI had a business relationship with STC.  A party is not secondarily liable for a primary actor's securities violations just because it does business with that actor, no matter the length of their relationship.[10]  Instead, SEI must have "possess[ed],

---

[10] *See, e.g.*, *Abbott*, 2 F.3d at 620–21 (holding that control was not established

direct[ly] or indirect[ly], . . . the power to direct or cause the direction of the management and policies of" STC. § 51:702(4). That SEI and STC have a contract is not enough; the contract must grant SEI the requisite control. This one does not. Indeed, in *Firefighters' Retirement System v. Citco Group Ltd.*, No. 20-30654, 2021 WL 1234258, at *4, 2 (5th Cir. Mar. 31, 2021) (per curiam) (unpublished), we determined that the plaintiff had failed to establish control-person liability, even where the defendant had had a long and substantial relationship with the primary violator, serving as its main source of credit as well as providing business operations services. The evidence suggests that SEI and STC's relationship was not as close as the one between the defendant and primary violator in *Firefighters'*. The plaintiffs' contention here fails.

Nor does the plaintiffs' reliance on the nature of SEI's BSP relationship with STC advance the ball. The plaintiffs lean on the following general description of the BSP model, lifted from SEI's regulatory filings:[11]

> The BSP model . . . was designed for Private Banks, and other trust organizations that prefer to outsource their entire investment operations. With the BSP solution, we assume the entire back-office processing function. The BSP model includes: investment processing; account access and reporting; audit,

---

despite plaintiffs' evidence of defendant's (1) involvement in issuing bonds for the primary violator's other transactions, (2) general knowledge of the status of the primary violator's debt offerings, and (3) influence over a particular bond transaction that did not form the basis for secondary liability); *Meek v. Howard, Weil, Labouisse, Friedrichs, Inc.*, No. 95-60680, 1996 WL 405436, at *3 (5th Cir. June 25, 1996) (per curiam) ("At best, the evidence arguably shows that Appellees had influence over Smith's commodities trading; it did not show that Appellees had anything to do with Smith's handling of the Meeks' securities investments, or any power to control his handling of those investments.").

[11] The plaintiffs did not raise the BSP characterization until their motion for reconsideration, in which they complained that the relevant documents "were first produced by SEI in the Spring of 2019." But the plaintiffs forget that Forms 10-K are public documents accessible on the website of the Securities and Exchange Commission. They also fail to see that certain testimony and documents produced as early as 2010 revealed that STC was a BSP client. To suggest that this evidence is "new" strains credulity.

> compliance and regulatory services; custody and safekeeping of assets; income collections; securities settlement; and other related trust activities.

But that paragraph outlines only a range of possible BSP services. Naturally, the client contracts determine what services SEI will actually provide, and, as explained above, the terms here devastate any theory that SEI had control, even drawing inferences in the plaintiffs' favor.[12]

Any determination that SEI's business services for STC constituted control is precluded by *Ahders*. There, plaintiffs who opted out of the class in the present case also sued SEI, asserting that SEI had control-person liability for STC's primary violations. *See Ahders*, 982 F.3d at 314. There, as here, the plaintiffs contended that "SEI had direct or indirect control over STC's primary violations due to various aspects of SEI's role as a service provider for STC." *Id.* at 316. Analyzing the same business services, we observed that "a reasonable jury could not conclude that SEI is liable as a control person merely because STC committed primary violations using SEI's services." *Id.* We held that SEI's production and sending of statements containing the value of the CDs to investors was insufficient to show control: "[C]ontrol over day-to-day operations is not facial evidence of control over a primary violation." *Id.* at 316–17.[13] Instead, it was incumbent on the plaintiffs here to show "control over the primary violations," and they

---

[12] *See, e.g.*, *Se. Wireless Network, Inc. v. U.S. Telemetry Corp.*, 2007 WL 1953148, at *3–4 (La. App. 1st Cir. July 6, 2007), *writ denied*, 967 So. 2d 525 (La. 2007) (holding that control was not established despite alleged control person's contracts that gave it supervisory authority over the issuer's "budget, operations, marketing, public relations, acquisitions, expenditures, stock issuances, and selection and hiring of key personnel").

[13] Furthermore, in *Firefighters'*, 2021 WL 1234258 at *3, the defendant not only created statements and sent them to investors but also provided the underlying accounting services and valuations for the statements, as well. We held that the fact that the defendant provided accounting services for the primary violator "does not establish that it had the 'power to direct or cause the direction of the management and policies of [the violator].'" *Id.* (quoting § 51:702(4)).

failed to do so. *Id.* at 317.

Next, the plaintiffs contend that, before evaluating control, the district court should have considered whether SEI was aware of STC's illegal activities. But the statute says the opposite. Section 714(B) carefully defines the stage at which SEI's knowledge becomes relevant, as it makes SEI's lack thereof an affirmative defense. *See* § 51:714(B). In other words, *if* SEI is proven to be in control, *then* it may raise the defense that it neither knew nor should have known of the violations. *Id.* To require the district court to consider knowledge before control would stand the statute on its head.[14]

Finally, the plaintiffs maintain that "control" can be shown where the alleged "control person is in a position to prevent the violation of the primary violator." But even if "[t]he rationale behind control person liability is that a control person is in a position to prevent the securities violation at issue," *TIG Specialty Ins. Co. v. Pinkmonkey.com Inc.*, 375 F.3d 365, 372 (5th Cir. 2004), the ability to stop a violation is not the same as the power to control it.[15] Furthermore, we rejected that same contention in *Ahders*, 982 F.3d at 316, stating that "[t]he control-person provision requires more than the power to stop a primary violation for an entity to be liable." Instead, the plaintiffs "must establish that SEI directly or indirectly had 'the power to direct . . . the management and policies' of STC." *Id.* (quoting § 51:702(4)). Summary judgment for SEI was proper.

## II.

The plaintiffs contend that the district court should have granted

---

[14] *See Trans Pac.*, 2017 WL 1376592, at *6 (describing control as the "threshold requirement . . . under Section 714(B)").

[15] *See Solow*, 7 So. 3d at 1281 (rejecting a control-person theory predicated on an allegation that the defendant "had the power to halt the sale"). We have praised *Solow*'s reasoning as "surely a correct interpretation of the control person statute." *Heck*, 775 F.3d at 285.

them a continuance under Rule 56(d) so that they could gather more discovery before facing summary judgment.  We review for abuse of discretion, *see Prospect Cap. Corp. v. Mut. of Omaha Bank*, 819 F.3d 754, 757 (5th Cir. 2016), and there is none.

A party who fails to pursue discovery with diligence is not entitled to Rule 56(d) relief,[16] and, as the district court recognized, the plaintiffs neglected to do so.  This case has been pending for more than a decade, and for north of seven years in federal court.

Yet the plaintiffs waited until May 2018—more than five years after the case was removed and almost three years after the parties filed their Rule 26(f) report—to move for a status conference.  After that, the plaintiffs waited until June 2018 to serve 134 interrogatories, noticed a Rule 30(b)(6) deposition three months later, and then failed to serve document requests until two months after that.

The plaintiffs maintain that the district court showed "a complete lack of understanding of the procedural gymnastics and complexity existing in this case over the last ten years."  They aver that the district court got the burdens backwards.  And they repeatedly accuse SEI of "[s]tonewall[ing]" their discovery efforts.

But even if SEI's discovery tactics were wrongful, the Federal Rules of Civil Procedure place the onus on the discovery-seeker to invoke the judicial process.  Rule 37 provides that a party may obtain a court order compelling discovery that it has not been able to obtain through cooperation with the other side.  *See* Fed. R. Civ. P. 37(a).  But the plaintiffs never took matters into their own hands, even though the MDL district judge reminded them of their right to file a motion to compel.  Instead, the first time they "sought

---

[16] *See, e.g.*, *Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797, 816 (5th Cir. 2017); *McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 700 (5th Cir. 2014); *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 606 (5th Cir. 2001).

judicial assistance in obtaining [discovery] was in response to [SEI's] summary judgment motion." *Jacked Up*, 854 F.3d at 816. Having dawdled for years, the plaintiffs had no right to a judicial rescue.[17]

AFFIRMED.

---

[17] *See Jacked Up*, 854 F.3d at 816 (holding that the nonmovant was not diligent, where it had not moved to compel the requested documents during discovery and had waited until summary judgment to seek judicial intervention); *Beattie*, 254 F.3d at 606 (holding that a nonmovant was not diligent, when she had waited "several months" to depose key witnesses); *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 28 F.3d 1388, 1397 (5th Cir. 1994) (holding that the district court did not err in denying a Rule 56(d) continuance where the plaintiffs "undertook no discovery . . . for more than one year" and only deposed witnesses "shortly before the summary judgment"); *Spencer v. FEI, Inc.*, 725 F. App'x 263, 269 (5th Cir. 2018) (per curiam) (holding that the plaintiff was not diligent when he had "waited for over a year to serve his first deposition subpoenas" and "filed his Rule 56(d) motion over a month after [the defendant] filed its motion for summary judgment and less than a month before the discovery deadline"); *Mitchell v. Sikorsky Aircraft*, 533 F. App'x 354, 358 (5th Cir. 2013) (per curiam) (holding that the plaintiff was not diligent where she waited until "three weeks before motions for summary judgment were due" to coordinate depositions, despite having more than seven months to seek discovery).